# United States Court of Appeals
## For the First Circuit

No. 13-1102

SIRAJ AHMAD KHAN,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before
Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for petitioner.
Kelly J. Walls, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Leslie McKay, Assistant Director, Office of Immigration Litigation, on brief for respondent.

August 9, 2013

**LYNCH, <u>Chief Judge</u>**.  On November 3, 2010, an immigration judge (IJ) denied Siraj Ahmad Khan's application for asylum, withholding of removal, and withholding under the Convention Against Torture (CAT).  The Board of Immigration Appeals (BIA) affirmed this denial on December 18, 2012.  Khan timely petitions for review of the BIA's decision.  We deny his petition.

I.

Khan is a native and citizen of Pakistan who entered the United States on April 5, 2008 on a seaman crew visa that authorized him to remain in the United States until May 4, 2008.  Khan had flown from Pakistan to Dubai and then to New York; his purported ultimate destination was Bermuda, where he was to rejoin the ship on which he worked.  Khan remained in the United States in New York instead.

On September 10, 2008, Khan filed an application for asylum and for withholding of removal in which he also sought protection under the CAT.  Khan alleged that he was eligible for relief based on claims he had and would suffer persecution because of his political opinion and membership in a particular social group.  On July 14, 2009, Khan was issued a notice to appear (NTA) which alleged that he was removable as an alien who had remained in the United States beyond May 4, 2008 without authorization.  Khan conceded the allegations in the NTA and sought the relief described.

-2-

A.          <u>Khan's Hearing Before the IJ</u>

On November 3, 2010, an IJ conducted a merits hearing in Khan's removal proceedings, at which Khan testified. We describe Khan's testimony and evidence.

Khan was born on December 24, 1958, in the village of Shah Dheri, in the Swat district in Pakistan. Khan had a wife and seven children who, at the time of the hearing, had remained in Pakistan but no longer resided in Shah Dheri; instead, they lived with relatives in other towns.

The Taliban became active in Khan's area of Pakistan in 2007, while Khan was away working on a ship. When Khan returned to Shah Dheri in January 2008, he found that the Taliban were forcing local residents to cut their hair and grow long beards, and that they were "brainwashing young people" via radio broadcasts. Khan also stated that the Taliban were kidnapping children to secure ransom money from their families.

Khan testified that the Taliban in fact blew up his daughter's school in January 2008. The Taliban believed that girls should not attend school and that English should not be taught in schools. Khan said that he "kn[e]w" the Taliban was responsible for destroying this school because "there is no one else" who would have done it. He conceded that the Taliban did not target his daughter's school specifically because his daughter went there.

Khan's view was that the Taliban's philosophy was "completely wrong" and "very bad for the future generation."

Khan testified that after returning home in January 2008, he started secretly urging his neighbors in the village "to make sure not to lose your freedom to Taliban" and "not to allow your children to be influenced by them." Khan also claimed that he went to the local police station ten to twenty times to report Taliban activities that community members described to him, and that the police initially arrested Taliban members based on this information, but later became ineffective.

Khan learned from a friend that the Taliban had held a meeting in a mosque where they discussed plans to blow up the local police station. Upon learning this information, Khan "informed to the police and they thanked [him] polite[ly]"; the police then called the army, which "put that area under surveillance and secure[d] it." Khan conceded that the presence of the army "improve[d] the situation in Shah Dheri," though he said the Taliban remained secretly active.

Khan testified that after he disclosed this Taliban plot to the police, someone threw a letter attached to a stone at his house. Khan submitted this letter into evidence with a translation; it stated:

From: Taliban
02/20/2008

Notice in the name of Siraj Ahmad . . .

-4-

You are getting informed by this notice and letter.  That you do not pay money to local Taliban nor do you feed them for one time meal.  And you speak against us.  And you are gathering with local police and army and spying on us.  Limit your actions, and quit that.  If you did not quit that we will bomb you and your children.  Then you will know.  There is no need for writing more.  That is all.

FROM TALIBAN COMMANDER SHAH DHERAI

Khan testified that the Taliban had learned that he was speaking against them through their "many spies," but also stated that he was initially "careless" in his activities concerning the Taliban, and became more secretive after receiving the letter.  Khan took the letter to the police, who attempted to investigate, but they told Khan that without knowing who had sent the letter they could not issue a bench warrant or take other action.

Khan claimed that he continued attempting to "unite the people and . . . get a group against [the Taliban]," but that his activities were ineffective because "the people" were afraid.

On the morning of March 7, 2008, someone threw a grenade at Khan's house.  Khan heard a noise, awoke, and found the undetonated grenade, but it did not explode.  Khan called the police, who came to his home and collected the undetonated grenade.  Later that day, the police filed a report concerning the incident that Khan submitted into evidence.  The report recorded that a hand grenade had been recovered from the veranda of Khan's house, and that the grenade "was thrown by some unknown terrorists."  The report stated that the case had been "registered" and was "being

-5-

investigated."[1]  Khan testified that the police took statements from witnesses, but were ultimately unable to catch the perpetrator of this attack because he remained unidentified.

Khan testified that after this incident, he concluded that the "they [the Taliban] are not leaving me alone."  He testified that "over there once a person is a target that person is gone, most of the targets are destroyed."  Khan therefore decided to rejoin the ship on which he worked, and left Pakistan on April 4, 2008.  However, upon arriving in New York en route to rejoining his ship in Bermuda, Khan said he "changed [his] mind" and decided to stay in the United States because if he rejoined his ship, he "would be with the ship for ten months and then [he] would go back home and it would be the same situation."  Khan admitted he left his wife and children in Pakistan and came to the United States less than a month after, by his account, his family was put at risk by the undetonated grenade.  He said he left because (1) the danger to him was greater than the danger to his family, and (2) if he had not left, his family would have "starved."

Khan has relatives living in Islamabad and Karachi.  He claimed, however, that even if he relocated within Pakistan, the

_____

[1] Khan also submitted into evidence a March 8, 2008 article from a newspaper, "The News International," which stated that "unidentified miscreants hurled a hand grenade at the house of one Siraj Ahmah Khan in Shah Daray area" which "did not explode" and "was later defused by the police disposal squad."  The IJ stated that this newspaper was "not a publication known to the Court and therefore is not a reliable source."

Taliban would find him because "[t]he entire Pakistan is in the hand of the Taliban." When cross-examined about this statement, Khan backtracked and admitted that the Taliban was "secretly active" in places such as Islamabad and Karachi, but not in control. He also conceded that the Taliban "cannot find [his children]" because "they are with [his] other relatives" in Islamabad.

As for Khan's wife, she was living with her brothers in a village five kilometers away from Shah Dheri. Khan testified that on one occasion, when his wife returned to their house in Shah Dheri, callers identifying themselves as "commanders of the Taliban" called the house four or five times and "told her you have to give us money." He also testified that they "threaten[ed] her that we would kidnap your kids." Khan stated that the objective of these callers was "to get money." According to Khan, a couple months later, the same people shot his house at night.[2] Khan did not explain how he knew who shot his house, and he had stated in an affidavit only that his "wife found bullet holes on the outside wall of [their] house." Khan also conceded that the area around Shah Dheri was a "war zone."

Khan testified that after he left Pakistan, the Taliban blew up the police station in Shah Dheri. However, he conceded

---

[2] Khan did not testify that anyone was living in the house at the time of the alleged shooting.

that the Pakistani army took control of the Swat area in 2009 and 2010, where they were essentially at war with the Taliban, and that the Taliban was only "secretly active staying in the mountains" in the area. Khan also admitted that neither his wife nor his children had been physically harmed by the Taliban since he had left Pakistan.

Khan submitted, as corroborative evidence, a translated letter from his wife which stated that the Taliban "want[ed] to kill [Khan] very soon" and that they had threatened Khan's family and several times "attacked . . . our home." Importantly, the affidavit did not mention the grenade incident, any threatening telephone calls, their house being shot at night, or that the Taliban had blown up the local police station. Specifically, it did not mention the threat supposedly made to Khan's wife to kidnap her children. Khan attempted to excuse these omissions by claiming that "the letter was written by the elderly people of the village who know the situation at the area and [his wife] just signed it." Khan also submitted his own affidavit in support of his application, which failed to mention that the Taliban had blown up the local police station.[3]

---

[3] When confronted with the fact that his affidavit omitted this fact, Khan incorrectly claimed that he "did write that the Taliban bl[e]w up the police station."

B.        The IJ's Denial of Khan's Application, and the BIA's
          Affirmance of the IJ's Decision on Appeal

On November 3, 2010, the IJ denied Khan's claims for relief. The IJ declined to make an adverse credibility finding regarding Khan, but noted concerns about his credibility.[4] The IJ did find that Khan's petition failed because of his failure to provide corroborating evidence or acceptably explain why he had not provided such evidence.[5]

The IJ also made independent findings to support denial. The IJ noted that though Khan's application was purportedly based on his membership in a particular social group, he had not identified the social group to which he claimed to belong. To the extent Khan's asylum application was based on membership in the group of informants to the police, the IJ concluded that informants do not constitute a particular social group. The IJ also concluded that insofar as Khan's application was based on his anti-Taliban political opinion, he had provided no evidence that the Taliban knew he held this opinion.

_____

[4] The IJ noted that neither Khan's affidavit nor Khan's wife's letter mentioned that the Taliban had blown up the Shah Dheri police station, and that Khan's wife's letter did not mention the grenade incident, the threatening phone calls, the threat to kidnap the children, or the shooting of their house. The IJ was "not satisfied" with Khan's explanation for these omissions, and particularly refused to credit his explanation for why his wife's letter did not mention the Taliban's "horrifying" threat to kidnap their children.

[5] The IJ noted that Khan had failed to provide sufficient evidence corroborating that he was a police informant in Pakistan.

Importantly, the IJ's denial of Khan's application for asylum, withholding of removal, and CAT protection was also based on grounds independent of any concerns about Khan's credibility and corroboration. The IJ's decision also went beyond the conclusion that Khan had not shown his past or future mistreatment was or would be on account of his political opinion or membership in a particular social group.

The IJ found that "even if it credited the respondent's testimony fully, it would find that he is not the victim of past persecution." The IJ concluded that the threatening letter and the undetonated grenade incidents had not resulted in any harm and did not rise to the level of past persecution. In addition, the IJ found that Khan was "victimized by the Taliban and not by the government of Pakistan," and that "[t]he government does not appear to have been unable or unwilling to control the Taliban."

As for Khan's alleged fear of future persecution, the IJ found that Khan did "not have an objectively reasonable fear of returning to Pakistan" even "[i]f his testimony had been credited fully." The IJ noted that Khan's wife and children had remained in Pakistan and had not been harmed. The IJ also stated that in 2009, the Pakistani army had occupied the Swat valley, where Khan's village was located, and that in any event neither Karachi nor Islamabad was controlled by the Taliban, so that Khan could relocate within Pakistan to avoid persecution. Finally, the IJ

determined that there was no connection between Khan's fear of future persecution and the Pakistani government. Because Khan's claim for asylum failed, the IJ rejected his claim for withholding of removal. The IJ also denied his CAT claim because "[h]is fear extends only to the Taliban."

Khan appealed to the BIA, which dismissed his appeal on December 18, 2012. The BIA affirmed the IJ's findings as to credibility and corroboration, and the BIA also affirmed the IJ's "determination that the respondent did not establish past persecution or a well-founded fear of future persecution even assuming that the respondent was credible." The BIA noted the paucity of specific information about Khan's purported assistance to the police and about the motive for any mistreatment by the Taliban. It found that the threatening letter and undetonated grenade thrown at Khan's house did not amount to past persecution, given that Khan did not in response move out immediately, and that Khan's fear of future persecution was not well-founded, since his family continued to live in Pakistan and had not been harmed. The BIA also found that "the record does not show that the respondent would not be able to relocate in Pakistan or that the Pakistani government would not assist or protect the respondent from the Taliban." The BIA affirmed the denial of Khan's claims for asylum, withholding of removal, and CAT protection.

II.

Where the BIA issues its own opinion, we review both that opinion and any portion of the IJ's opinion that the BIA adopted. Ouk v. Gonzales, 464 F.3d 108, 110 (1st Cir. 2006). We review the BIA's determinations under the deferential substantial evidence standard, id. at 111, which means we will uphold these determinations unless "any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B).

To be eligible for asylum, an applicant must be a "refugee," id. § 1158(b)(1)(A), who is unwilling or unable to return to his home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," id. § 1101(a)(42)(A). A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. Nelson v. INS, 232 F.3d 258, 264 (1st Cir. 2000).

On petition for review, Khan argues that the BIA erred in failing to accord him a rebuttable presumption of credibility, and in rejecting his argument that his persecution was or would be on account of his imputed anti-Taliban political opinion. As said, the IJ's and BIA's decisions rested on alternate grounds as well,

-12-

independent of these grounds, and we do not address these arguments.[6]

Khan also argues that the BIA erred in concluding that: (1) the Pakistani government could protect him from the Taliban; (2) his past treatment did not rise to the level of persecution; (3) his fear of future persecution was not well-founded; and (4) he could reasonably relocate within Pakistan to avoid persecution. Because we reject Khan's argument that the agency was compelled to find a government nexus that could support a finding of persecution, we need not address the agency's finding that Khan's past treatment did not rise to the level of persecution. Though the lack of a government connection also dooms Khan's claim of a well-founded fear of future persecution, we conclude that the agency's finding that no such fear existed was independently supported by substantial evidence, including its determination that

---

[6] Because Khan submitted his application for asylum, withholding of removal, and protection under the CAT on September 10, 2008, the REAL ID Act of 2005 (which became effective on May 11, 2005) applies to his application. See 8 U.S.C. § 1158 note (Effective Date of 2005 Amendment); Tay-Chan v. Holder, 699 F.3d 107, 111 n.4 (1st Cir. 2012). However, since we do not reach Khan's arguments concerning credibility and corroboration, or whether his alleged persecution was or will be on account of a protected ground, the amendments introduced by the REAL ID Act are not relevant to our analysis. See Guta-Tolossa v. Holder, 674 F.3d 57, 62 (1st Cir. 2012) (describing changes made by REAL ID Act to law regarding credibility and the need for corroborating evidence); Sompotan v. Mukasey, 533 F.3d 63, 69 n.3 (1st Cir. 2008) (describing REAL ID Act's requirement that applicant show a protected ground was a "central reason" for persecution).

Khan had not demonstrated he could not reasonably relocate within Pakistan.

A.      The BIA's Determination That Khan Had Not Established the Pakistani Government Would Not Assist or Protect Him

Khan's first argument is that no reasonable person could find he had failed to meet his burden to show a connection between his mistreatment in the Swat valley in 2008 and the Pakistani government. Persecution "always implies some connection to government action or inaction," Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005), and "violence by private citizens . . ., absent proof that the government is unwilling or unable to address it, is not persecution," Butt v. Keisler, 506 F.3d 86, 92 (1st Cir. 2007). As we explained in Burbiene v. Holder, 568 F.3d 251 (1st Cir. 2009), where a government is "making every effort to combat" violence by private actors, and its "inability to stop the problem" is not distinguishable "from any other government's struggles," the private violence has no government nexus and does not constitute persecution. Id. at 255-56 (internal quotation marks omitted). We have been particularly unwilling to overturn a finding of no government connection where the local authorities have appropriately responded to incidents of violence. See Ortiz-Araniba v. Keisler, 505 F.3d 39, 42 (1st Cir. 2007).

Khan claims that he presented compelling evidence of Pakistan's inability to protect him from the Taliban. In reality, Khan testified that the Pakistani police responded to his

-14-

information about Taliban activities by arresting Taliban members and calling on the Pakistani army to secure the area, and he conceded that this "improve[d] the situation." He also testified that after the Taliban sent him a threatening letter and threw a grenade, which did not detonate, at his house, the local police wrote reports, took witness statements, and attempted to investigate, but were stymied by the fact that the identities of the perpetrators remained unknown. Khan also conceded that the Pakistani army took control of the Swat valley, where his village was located, in 2009 and 2010, and that the Taliban was no longer openly active in the area.

Far from showing that Pakistan is "unwilling or unable to pursue . . . lines of redress on [Khan's] behalf," Guaman-Loja v. Holder, 707 F.3d 119, 124 (1st Cir. 2013) (quoting Castillo-Diaz v. Holder, 562 F.3d 23, 28 (1st Cir. 2009)) (internal quotation mark omitted), the evidence shows that the Pakistani government has actively sought to protect Khan from the Taliban and that it has been to some extent successful in controlling the Taliban in the Swat valley, even if it has not eradicated the threat the Taliban poses. Where, as here, the government "has experienced both setbacks and successes in its fight," Burbiene, 568 F.3d at 255, the BIA does not err in concluding that there is no government connection to support a finding of past or future persecution.

-15-

This case is in contrast to Khattak v. Holder, 704 F.3d 197 (1st Cir. 2013), where petitioner was a prominent political figure and special police officer engaged in anti-Taliban activities. Id. at 200. The petitioner there, along with his wife and children, sought asylum based on their fear of future persecution by the Taliban in Pakistan. Id. at 199. They said they would be specially targeted. Id. at 204 n.7.

We granted the petition for review and remanded the case to the BIA. Id. at 208. We explained that the IJ and BIA stated there was no corroborative evidence that persons in petitioner's position could not be protected by the government, when there was exactly such evidence. Id. at 206. We also held that the agency had failed to "offer legally sufficient reasons for its decision." Id. at 208 (quoting Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004)) (internal quotation marks omitted). We explained that the IJ found there was no government nexus because generally there was "a war going on involving the Taliban," the Pakistani government was "in fact taking on the Taliban," and "the government continues to make inroads against the Taliban. Id. at 206 (internal quotation marks omitted). However, the IJ did not "explain what these 'inroads' were," and the BIA "added little to the IJ's analysis." Id. We remanded for further explanation.

Here, neither the IJ nor the BIA mischaracterized the evidence in the record concerning the Pakistani government's

ability to protect Khan, and the IJ explained at some length why Khan had not carried his burden of showing a government nexus:

> The government does not appear to have been unable or unwilling to control the Taliban at that time [of Khan's mistreatment]. Indeed, the police investigated the respondent's complaint, recovered evidence, specifically, the grenade, wrote reports about the incident, took witness statements, but did not catch the perpetrator, not because it did not wish to, but because, as the testimony establishes, the perpetrator was not identified.

The IJ also explained that "in 2009 and 2010 the army of Pakistan occupied the Swat Valley where the respondent's village is located." The BIA adopted the IJ's findings on this point. The agency here therefore offered legally sufficient reasons for its findings, and this case is distinguishable from Khattak.

Our rejection of Khan's first argument by itself requires his petition be denied. Nonetheless, we address his remaining arguments as to whether he demonstrated a well-founded fear of future persecution.

B.      The BIA's Determination that Khan Could Reasonably Relocate Within Pakistan and So Did Not Face a Well-Founded Fear of Future Persecution

Khan's arguments regarding his fear of future persecution are unavailing. As we have explained, "the fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return." Lobo v. Holder, 684 F.3d 11, 19 (1st Cir. 2012) (quoting Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir. 2008)) (internal quotation marks

-17-

omitted).  Khan also conceded that in 2009 and 2010 the army had taken control of the Swat valley, where Shah Dheri was located, and driven the Taliban into hiding.

Furthermore, because Khan was unable to demonstrate a connection between his mistreatment and the Pakistani government, he failed to show past persecution or that any persecution would be by a government or government-sponsored.  He therefore "bear[s] the burden of establishing that it would not be reasonable for him . . . to relocate."  8 C.F.R. § 208.13(b)(3)(i).  Khan testified that the Taliban was "secretly active" in Islamabad and Karachi, and presented evidence that the Taliban had carried out attacks in those cities.  But he admitted that the Taliban did not control Islamabad or Karachi, and that his children had safely resided in Islamabad since he left Pakistan, despite his assertion that they were Taliban targets.  The BIA did not err in concluding that Khan had not met his burden of showing he could not reasonably relocate within Pakistan to avoid persecution, and that he did not face a well-founded fear of future persecution.

This case is distinguishable from Khattak on this point, as well.  In that case, regarding the reasonableness of internal relocation, we explained that "neither the IJ nor the BIA addressed evidence in the record indicating that the Taliban's reach may extend as far as Islamabad," in light of evidence that even in Islamabad the petitioner faced a risk of being the subject of a

targeted killing, as others had been.  704 F.3d at 207.  Here, the IJ explicitly noted Khan's "testimony that [the Taliban] continue to be secretly active in" Islamabad and Karachi, but explained that "[e]ven the respondent agreed that neither Islamabad nor Karachi is controlled by the Taliban."  The IJ also observed that Khan's children had remained safe in Pakistan through internal relocation. The BIA adopted the IJ's reasoning on these points.  As with its finding that Khan failed to demonstrate a government nexus, the agency here offered legally sufficient reasons for its finding that Khan had not carried his burden of showing the unreasonableness of relocation within Pakistan.

The failure of Khan's asylum claim dooms his claim for withholding of removal.  Zheng v. Gonzales, 416 F.3d 97, 101 n.3 (1st Cir. 2005).  Because Khan did not establish a connection between his mistreatment and the Pakistani government, his CAT claim likewise fails.  See 8 C.F.R. § 1208.18(a)(1) (to constitute torture, pain or suffering must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity").

III.

Khan's petition for review is denied.