# United States Court of Appeals
## For the First Circuit

No. 17-1457

JAVIER ROSALES JUSTO,

Petitioner,

v.

JEFFERSON B. SESSIONS III,

Attorney General of the United States,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lipez, and Kayatta,
Circuit Judges.

Talia Barrales, with whom Law Offices of Talia Barrales was on brief, for petitioner.
Rebekah Nahas, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, with whom Chad A. Readler, Acting Assistant Attorney General, Civil Division, and Briena L. Strippoli, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

July 16, 2018

**LIPEZ**, **Circuit Judge**.  Petitioner Javier Rosales Justo ("Rosales"), a citizen of Mexico, claims that the Board of Immigration Appeals ("BIA") erred when it reversed an immigration judge's order granting him asylum.  The immigration judge ("IJ") concluded that Rosales met his burden of proving he was entitled to asylum based, inter alia, on a finding that the police in Mexico would be unable to protect him from members of organized crime who had murdered his son and continued to target him and the rest of his nuclear family.  The BIA rejected that finding, concluding that it was clearly erroneous.

We agree with Rosales that the BIA's conclusion that the IJ's finding was clearly erroneous is unfounded because the BIA committed several errors in its review of the IJ's decision.  Most importantly, the BIA failed to examine separately the evidence of the government's willingness to protect Rosales from persecution and the evidence of its ability to do so.  Instead, the Board cited evidence only of the willingness of local authorities to promptly investigate the murder of Rosales's son as support for its conclusion that the IJ's finding of inability was clearly erroneous.  Because of the BIA's flawed analysis of the IJ's decision, we grant Rosales's petition and remand the case to the BIA for reconsideration of Rosales's eligibility for asylum.

## A.   Factual Background

Rosales applied for admission to the United States immediately upon arriving with his wife and children at the border crossing in San Ysidro, California on May 9, 2016.  He was detained, transferred to a correctional facility in Plymouth, Massachusetts, and subsequently served with a notice to appear charging him with removability because he lacked a valid entry document.  See 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Rosales conceded removability, but requested asylum pursuant to section 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158, and cancellation of removal pursuant to 8 U.S.C. § 1231(b)(3).  A hearing before an IJ was held on October 21, 2016.  Rosales and his wife both testified at the hearing, and Rosales also submitted extensive documentary evidence, including declarations from himself and his family members, reports from the U.S. Department of State and international non-governmental organizations regarding country conditions in Mexico, and documents and reports from the police investigation into his son's murder.  In reaching his decision, the IJ considered "[a]ll admitted evidence . . . in its entirety, regardless of whether [it was] specifically mentioned" in the decision.

Finding the testimony of Rosales and his wife credible, the IJ found the following facts.  Rosales is a 39-year-old police

officer from Acapulco, a city in the state of Guerrero. The tragic events that precipitated his move to the United States began on January 24, 2016. That afternoon, his wife, Vincenta, and son, Tomas, were working at the store that the family ran to supplement Rosales's income as a police officer. Two strangers walked into the store and demanded that the family pay "rent" to them. When Vincenta asked, "what rent?," they told her that the family must pay 2,000 pesos every two weeks. Vincenta responded that her family could not afford to pay that amount because the store was too small to generate enough money. One of the men became upset with her and stated that if she did not pay, her family would face the consequences.

Following this threatening encounter, Rosales and his wife decided to close the store. Although they did not know the identity of the men who had come to the store, they believed they were members of organized crime. However, Vincenta testified that she did not report the threat to police because she thought it would "blow over."[1] After a week, Vincenta decided to reopen the store because the family needed the income.

On the evening of February 4, Vincenta heard gunshots while she was working at the store. Earlier, her daughter had

---

[1] Although the IJ mentioned only Vincenta's testimony on this point, Rosales testified that Vincenta did not report the extortion attempt because "she was scared."

told her that Tomas had stopped at home after school to change clothes and then left to go help a friend paint nearby. After hearing the gunshots, Vincenta went to look for Tomas and could not find him.[2] She called Rosales at work to tell him that Tomas was missing, and they went to the police station and the ministry of police to see if Tomas had been detained by the police in either place. Not finding him and fearing the worst, Rosales also checked the morgue to no avail.

The next day, having still not found Tomas, Rosales was informed by friends that a body had been found on the side of a nearby highway, and Rosales and Vincenta went there. After speaking with the federal police who were at the scene and being shown a photo of the body, they identified the victim as Tomas. He had been shot five times, and there was evidence that he was tortured before his death. A forensic team was called to examine the body, and the police took statements from Rosales and his wife and opened a criminal investigation. Rosales also hired a lawyer to conduct a separate investigation into the murder.

Fearing for his family's safety following Tomas's death, Rosales moved with Vincenta and their two daughters to Pueblo

---

[2] Although not specifically mentioned by the IJ, Vincenta testified that the shooting occurred in the area where Tomas was painting. When she went to that area after the shooting stopped, someone told her that a person who looked like Tomas had been taken away by unknown people in a truck.

Viejo, a town several hours from Acapulco where Rosales has extended family. Approximately eleven days after the murder, their neighbors from Acapulco reported to Rosales that they had seen suspicious cars near Rosales's old house and several unknown men with guns "from organized crime" had asked a neighbor whether Rosales and his family still lived there. Two months later, in April, several unknown men came to their neighborhood in Pueblo Viejo and asked for the location of the Rosales family. Rosales did not report these incidents to the police because he was afraid members of organized crime would find him and kill him. Fearing that he and his family were at risk of being murdered if they stayed in Mexico, Rosales decided to move with Vincenta and his daughters to the United States in May 2016.

Because he had been detained until the day of the hearing, Rosales had not recently spoken to the police in Acapulco about the status of the investigation into his son's murder. He was therefore unable to say for certain at the hearing that no one had been arrested for the murder. Similarly, although Rosales believed that his extended family in Pueblo Viejo had not been contacted or harmed by organized crime in the time that he was living in the United States, "he was not sure" due to the limited contact he had with his extended family during his detention.

## B.    The IJ's Decision

Based on the above factual findings, the IJ concluded that Rosales had a well-founded fear of future persecution because of his membership in his nuclear family.[3]  In particular, the IJ found that the credible testimony of Rosales and his wife established that individuals "presumably associated with organized crime[] wanted to extort money from [Rosales]" and that "the minute [Rosales]'s wife refused, or did not pay the demand," they targeted his family for "a retaliatory hit, not just because the money was not paid, but because at this juncture, the unknown assailants wanted to inflict the consequences that they promised."  Thus, the IJ found that Tomas's murder was "directed at [Rosales]'s nuclear family because of the failure to pay the rent."

Further, the IJ noted that "armed men" who "were not members of the Mexican police" were "patrolling [Rosales]'s home in Acapulco, and specifically asked about [Rosales]'s and his family's whereabouts," and that "other unknown individuals were looking for [Rosales] and his family in Pueblo Viejo."  The IJ

---

[3] Family membership "can be a sufficiently permanent and distinct characteristic to serve as the linchpin for a protected social group within the purview of asylum laws," so long as the applicant's "family membership itself brings about" the feared persecution.  Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008). The finding by the IJ that there was a sufficient nexus between the persecution suffered by Rosales and his membership in his nuclear family was not challenged by the government on appeal to the BIA.

concluded that "[t]his tracking and directing and looking for [Rosales]'s family, combined with the initial threats," provided an objective basis for Rosales's fear that he would be targeted by organized crime if he returned to Mexico.

In addition to the testimony of Rosales and his wife, the IJ relied on the Department of State report on country conditions in Mexico to support the conclusion that someone in Rosales's "particularized situation would fear harm in Mexico." The IJ noted both the report's general statements that "[o]rganized criminal groups killed, kidnapped, and intimidated citizens, migrants, journalists, and human rights defenders" throughout Mexico, and its specific descriptions of crime in Rosales's home state of Guerrero, including the kidnapping of a journalist and the disappearances and murders of students, and the general "impunity of organized crime and drug traffickers in Guerrero."[4]

After finding that Rosales reasonably feared persecution if he returned to Mexico, the IJ concluded that Rosales had met

---

[4] The IJ also found that Rosales had proved by a preponderance of the evidence that he would be unable to avoid persecution by relocating within Mexico. See 8 C.F.R. § 1208.13(b)(1)(i)(B) (permitting the IJ to deny an asylum application where "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality"). The IJ relied on the evidence that members of organized crime looked for Rosales in Pueblo Viejo, as well as country reports stating that organized crime is a problem throughout Mexico and that Mexico has "a significant problem with internally displaced persons" due to organized crime-related violence. The conclusion that Rosales could not relocate within Mexico is not at issue in this appeal.

- 8 -

his burden of proving a government nexus for that persecution by showing that the government was unable or unwilling to control the members of organized crime who had threatened to harm him and his family. The IJ recognized that "police took an immediate and active interest in the respondent's son's murder," noting that Rosales observed seven officers and a forensic team at the scene where Tomas's body was recovered, the police took statements from Rosales and his wife, and an autopsy was performed. However, the IJ ultimately concluded that these investigative steps showed only that the police were "willing to take on organized crime," not that "the government is able to protect its citizens from organized crime."

To determine whether the government was able to protect Rosales from organized crime, the IJ, "[l]ooking at the specific facts of this record," found that the country condition reports submitted by Rosales demonstrated that there was corruption among police in Guerrero, and that they were unable to control organized crime. In particular, the IJ referred to a report written by the International Crisis Group (ICG), stating that "violence remains an intense problem in states such as Guerrero, which, in 2014, had the highest homicide rate, where bloodshed is rising." Moreover, the report stated that, "[d]espite deployment of more federal police," the homicide rate in Guerrero had risen by more than 20 percent in the first half of 2015. Indeed, it noted that "some 94

percent of all crimes go unreported" in Guerrero, implying both that the real homicide numbers may be higher and that citizens of Guerrero lack faith in the ability of police to bring criminals to justice. Quoting the article, the IJ emphasized that "[i]mpunity, even for homicide, is the norm."

Additionally, the IJ pointed to the Department of State country condition report, which described "numerous reports of government corruption throughout [2015]." Specifically, "there were reports that police, particularly at the state and local level, were involved in kidnapping, extortion, and providing protection for or directly acting on behalf of organized crime and drug traffickers." The IJ concluded that, "[u]nder these country conditions, as articulated in this specific case, I do find that while the Mexican government made some efforts to investigate the crime, such action does not show that the government is going to be able to protect the respondent." The IJ therefore granted Rosales's application for asylum.

## C. The BIA's Decision

The government appealed, and the BIA reversed. The Board deemed clearly erroneous the IJ's finding that the government of Mexico was "unable or unwilling" to protect Rosales. Unlike the IJ, however, the BIA did not separately assess the Mexican government's ability to protect Rosales after it discussed the evidence of the government's willingness to investigate his son's

murder. Listing the steps the police had taken to investigate the murder, the BIA observed that Rosales had not reported to the police the extortion attempts before the murder or efforts by organized crime to find his family after the murder. The BIA faulted the IJ for giving weight to the country condition reports and articles about crime in Guerrero instead of the individualized evidence regarding the police response to Tomas's murder, stating that "[t]he immigration judge appears to have deferred to the background evidence, and essentially discounted the actual, individualized evidence of record in this case showing that the police in Mexico initiated an investigation of the respondent's son's murder."

The BIA concluded that "the Immigration Judge's finding that the police would be unable or unwilling to control the persons the respondent fears (assuming they are not already imprisoned) is impermissibly speculative, and is clearly erroneous." To bolster this conclusion, the BIA added that "the First Circuit . . . has held that where a government is 'making every effort to combat' violence by private actors, and 'its inability to stop the problem' is not distinguishable 'from any other government struggles,' the private violence has no government nexus and does not constitute persecution."

One Board member dissented from the decision, stating her view as follows:

> Although the majority correctly concludes that some evidence in the record does not support the Immigration Judge's determination that the respondent demonstrated that the Mexican government would be unable or unwilling to control the persecutors whom he fears, other evidence <u>does</u> support that determination. <u>See</u> Exh. 4 at 65, 109.[5] Consequently, the Immigration Judge cannot be said to have <u>clearly</u> erred in that regard.

Rosales timely filed this petition for review challenging the BIA's reversal of the IJ's inability finding, primarily arguing that the BIA committed a legal error by failing to differentiate between the Mexican government's willingness and ability to protect him.

**II.**

**A.   Standard of Review**

"Where, as here, 'the BIA has conducted an independent evaluation of the record and rested its decision on a self-generated rationale,' we focus our review on the decision of the BIA, rather than the decision of the IJ." <u>Gonzalez</u> v. <u>Holder</u>, 673 F.3d 35, 38 (1st Cir. 2012) (quoting <u>Zhou Zheng</u> v. <u>Holder</u>, 570 F.3d 438, 440 (1st Cir. 2009)).  Specifically, we review de novo the determination by the BIA that the immigration judge's finding that the police would be unable or unwilling to protect Rosales was clearly erroneous.  <u>See</u> <u>Alimbaev</u> v. <u>Att'y General</u>, 872 F.3d

---

[5] This citation is a reference to the country condition reports submitted by Rosales.

188, 194 (3d Cir. 2017); Wu Lin v. Lynch, 813 F.3d 122, 129 (2d Cir. 2016).

In an effort to avoid de novo review of the decision of the BIA, the government tries to transform the BIA's decision into something it is not -- a factual finding by the BIA that Rosales failed to show that the Mexican government was either unwilling or unable to protect him, and therefore a finding that we must review under the deferential substantial evidence standard. See Ortiz-Araniba v. Keisler, 505 F.3d 39, 42 (1st Cir. 2007). Pursuant to that standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B); Limani v. Mukasey, 538 F.3d 25, 30 (1st Cir. 2008).  Without acknowledging Rosales's argument that the BIA committed a legal error, the government contends that we must therefore affirm the BIA's decision unless the evidence in the record compels a contrary conclusion.

That approach reflects a profound misunderstanding of the law.  Most fundamentally, the BIA's regulations prohibit it from engaging in fact-finding.  See 8 C.F.R. § 1003.1(d)(3)(iv) (stating that "the Board will not engage in factfinding in the course of deciding appeals").  Instead, it is limited to making legal conclusions and evaluating the IJ's findings of fact for clear error.  See id. §1003.1(d)(3)(i)-(ii); see also Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008).  The BIA observed that

- 13 -

limitation here, concluding that the central factual finding by the IJ -- that the Mexican government was unable to protect Rosales -- was clearly erroneous.[6]  That determination is not, as the government contends, an "administrative finding of fact" subject to the substantial evidence standard, 8 U.S.C. § 1252(b)(4)(B), but a legal determination that the evidence in the record was insufficient as a matter of law to support the IJ's factual finding. See Wu Lin, 813 F.3d at 129 ("The BIA's application of 'clear error' review is the application of a legal standard to findings of fact and as such is a ruling of law.").

To be sure, in the usual case where the BIA has adopted or affirmed the IJ's findings, the factual findings at issue before us on appeal from the BIA's decision remain the factual findings of the IJ.  Thus, we do not draw a distinction between the two for the purposes of the standard of review, and we review the factual findings -- which were originally made by the IJ but affirmed by the BIA -- under the substantial evidence standard, rejecting them only if the evidence in the record compels a contrary result. See 8 U.S.C. § 1252(b)(4)(B).  At times while conducting such a review, we have referred to the findings we are reviewing as the "BIA's factual findings," when it would be more precise to describe them

---

[6] Whether a government is unwilling or unable to protect an asylum applicant from persecution "is a question of fact." Ortiz-Araniba, 505 F.3d at 42.

as the findings of the IJ that have been adopted or affirmed by the BIA. See, e.g., Ortiz-Araniba, 505 F.3d at 42 (reviewing under the substantial evidence standard the BIA's determination that the asylum applicant had not proved that the government was unwilling or unable to protect her where the BIA had affirmed an IJ's finding on that point). Cf. Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007) (applying a deferential standard only to the "IJ's findings of fact").

This appeal is not the usual case because the BIA rejected the crucial factual finding of the IJ. Indeed, we have never had occasion to squarely address the standard of review when the BIA concludes that a factual finding of the IJ is clearly erroneous. However, we have applied de novo review to the similar inquiry of whether the BIA appropriately applied the clear error standard or instead engaged in improper fact-finding, see Liu Jin Lin v. Holder, 723 F.3d 300, 305 (1st Cir. 2013), and our sister circuits have held that de novo review is the appropriate standard when the BIA rejects a factual finding of the IJ as clearly erroneous, see, e.g., Wu Lin, 813 F.3d at 129; Alimbaev, 872 F.3d at 194, 197. We agree that, because the BIA's holding that the IJ committed clear error is legal in nature, our review of that conclusion is de novo.

As in other cases where we review the BIA's conclusions de novo, we are limited by the well-established principle that an

- 15 -

appellate court "should judge the action of [the BIA] based only on the reasoning provided by the agency, not based on grounds constructed by the reviewing court."  Mejia v. Holder, 756 F.3d 64, 69 (1st Cir. 2014) (quoting Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004)) (alteration in original).  As a result, we do not look at the entire record and determine anew whether, in our judgment, the IJ committed clear error in finding that the Mexican government was unable to protect Rosales.  Instead, we conduct de novo review only of the justifications provided by the BIA for concluding that the IJ's finding that the Mexican government was unable to protect Rosales was clearly erroneous.  See Wu Lin, 813 F.3d at 129.[7]

**B.    The BIA's Misapplication of the Unwilling or Unable Standard**

To qualify for asylum, an applicant must "demonstrate either past persecution or a well-founded fear of future persecution on account of her race, religion, nationality, political opinion, or membership in a particular social group." Ortiz-Araniba, 505 F.3d at 41; see 8 U.S.C. § 1101(a)(42)(A); id. § 1158(b)(1)(B)(i).  Where a private actor, rather than the government itself, is alleged to be the persecutor, the applicant must demonstrate "some connection" between the actions of the

---

[7] In that particular sense, de novo review of BIA decisions is different from de novo review of district court decisions, where we can affirm for any reason supported by the record.  See P.R. Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 224 (1st Cir. 2006).

- 16 -

private actor and "governmental action or inaction." Ortiz-Araniba, 505 F.3d at 41. To demonstrate such a link, Rosales had the burden of proving that the government was either "unwilling or unable" to protect him from persecution. Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009). Rosales contends that the BIA, in determining that the IJ's finding of inability to protect Rosales was clearly erroneous, misapplied the unwilling or unable standard by treating it as one element, rather than separately examining the government's unwillingness and its inability. We agree.

The BIA's application of the "unwilling or unable" standard is a legal question that we review de novo. See Madrigal v. Holder, 716 F.3d 499, 506 (9th Cir. 2013) (holding that misapplication of "unwilling or unable" standard was legal error). We have consistently stated that an applicant must prove either unwillingness or inability. See, e.g., Khan v. Holder, 727 F.3d 1, 7 (1st Cir. 2013) (stating that there must be proof that "the government is unwilling or unable to address" private violence (emphasis added) (quoting Butt v. Keisler, 506 F.3d 86, 92 (1st Cir. 2007))); Jorgji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008) (requiring a showing "that the persecution is due to the government's unwillingness or inability" to control the conduct of private actors (emphasis added)); Ortiz-Araniba, 505 F.3d at 41 (requiring a showing of the "government's unwillingness or

- 17 -

inability to control private conduct" (emphasis added)(quoting Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir. 2006))).

In Khattak v. Holder, 704 F.3d 197, 206 (1st Cir. 2013), we demonstrated that unwillingness and inability are distinct issues, and that an applicant may be able to prove inability without proving unwillingness where the government's willing efforts to protect its citizens fall short. There, we held that the BIA erred when it concluded that the Pakistani military's actions in fighting the Taliban showed both willingness and ability to protect Khattak, an anti-Taliban politician. Id. We explained that "although such military action indicates that the Pakistani government is willing to take on the Taliban, such action does not show that the Pakistani government is able to protect its citizens from Taliban attacks." Id. Accordingly, we remanded the case to the BIA for reconsideration of its conclusion that the government was neither unwilling nor unable to protect Khattak.

The BIA here missed the distinction drawn by the IJ between the Mexican government's willingness to investigate Tomas's murder and its ability to protect Rosales in the future. It therefore incorrectly described the IJ's decision as finding "that the general background country evidence showed that the police would be unable or unwilling to protect the respondent." (Emphasis added.) Elaborating on that description, as noted earlier, the BIA stated that "[t]he Immigration Judge appears to

have deferred to the background evidence, and essentially discounted the actual, individualized evidence of record in this case showing that the police in Mexico initiated an investigation of the respondent's son's murder."

To the contrary, as described above, the IJ thoroughly discussed the police investigation in assessing the government's willingness to protect Rosales, but concluded, based on the country condition reports and other evidence in the record, that the government would nonetheless be unable to protect him. Therefore, as a result of conflating unwillingness and inability, the BIA erroneously concluded that the IJ should have found that evidence of willingness (the police investigation) contradicted evidence of inability (Rosales's testimony and the country condition reports regarding impunity for organized crime and police corruption), when in fact the IJ appropriately discussed evidence of unwillingness and evidence of inability separately.

In support of the BIA's decision, the government cites two of our cases that it says stand for the proposition that a police response to persecution, such as the investigation here of Tomas's murder, is sufficient to demonstrate that the government is both willing and able to protect an asylum applicant, and that therefore the BIA did not need to consider more than the police investigation to conclude that the IJ's inability finding was clearly erroneous. See Khan, 727 F.3d at 7-8; Ortiz-Araniba, 505

F.3d at 42.  The government misreads our precedent.[8]  In <u>Khan</u>, we not only noted that the Pakistani government had investigated Khan's reports of persecution by the Taliban and had "actively sought to protect [him]," 727 F.3d at 8, but we also described his testimony that the government had "arrest[ed] Taliban members and call[ed] on the Pakistani army to secure the area" where he lived, which Khan acknowledged had "improve[d] the situation," <u>id.</u> at 7 (alteration in original).  There, unlike the circumstances here, the investigative efforts by the government had proved fruitful, demonstrating the ability of the police to protect Khan from persecution.

Likewise, in <u>Ortiz-Araniba</u>, there was evidence that the police not only responded to the applicant's complaint about persecution, but also arrested the perpetrator, who was convicted of the crime and served four years in prison.  505 F.3d at 42. Given that scenario, we concluded that the successful prosecution was evidence of both willingness and ability to protect the asylum applicant, and that such evidence could serve to rebut the country condition evidence relied on by the applicant to show inability. <u>Id.</u> at 42-43; <u>see</u> <u>also</u> <u>Harutyunyan</u> v. <u>Gonzales</u>, 421 F.3d 64, 68

---

[8] To the extent that our combined discussion of "unwillingness or inability" in some cases has obscured the distinction between the two -- despite our consistent use of the disjunctive "or" -- we clarify now that the inquiry into whether there is a government nexus must include separate consideration of the evidence of unwillingness and the evidence of inability.

(1st Cir. 2005) (finding no inability where "the local authorities responded immediately to each incident," and "the police succeeded in tracking down the malefactors and initiated criminal proceedings against them"); Matter of A-B-, 27 I. & N. Dec. 316, 343 (Att'y Gen. 2018) (finding that the BIA erred in overturning the IJ's finding that the police were able to protect the petitioner where she "not only reached out to police, but received various restraining orders and had [the persecutor] arrested on at least one occasion").  Here, on the other hand, the evidence in the record showed only that the police made efforts to investigate Tomas's murder.  The evidence showed nothing about the quality of this investigation or its likelihood of catching the perpetrators.  Indeed, evidence about law enforcement in Guerrero generally suggested that the investigation was unlikely to make Rosales's family any safer.  Therefore, unlike Khan and Ortiz-Araniba, the evidence of the investigation here was insufficient to justify the BIA's conclusion that the IJ clearly erred in finding that the Mexican police were willing but unable to protect Rosales.

## C.  Country Condition Reports

As a result of treating unwillingness and inability as one element, the BIA erroneously dismissed the country condition reports that were the basis for the IJ's finding of inability as mere "background evidence" that was too general to support a finding of inability in light of the more specific -- and in its

view, contradictory -- evidence of the police investigation. See Amouri v. Holder, 572 F.3d 29, 35 (1st Cir. 2009) (stating that, while "country conditions reports are deemed generally authoritative in immigration proceedings, the contents of such reports do not necessarily override petitioner-specific facts"). Focusing only on the willingness of the police to investigate Tomas's murder, the BIA did not recognize the value of the country condition reports as support for the IJ's finding that the Mexican police were unable to protect Rosales under the specific facts of his case.

Although in some cases country condition reports can be too generalized to support a finding of inability, see, e.g., Mendez-Barrera v. Holder, 602 F.3d 21, 28 (1st Cir. 2010); Amouri, 572 F.3d at 35, the country condition reports cited by the IJ here were particularly probative because they closely mirrored the specific circumstances described by Rosales, and thus were corroborative of his testimony. For example, the International Crisis Group report described a skyrocketing homicide rate in Guerrero "[d]espite deployment of more federal police," and stated that, in Guerrero specifically, "impunity, even for homicide, is the norm." Those statements are consistent with the testimony of Rosales, a police officer himself, that organized crime kills "three or four people a day" in Acapulco and that arrests are rarely made for such crimes.

Also singling out Guerrero as a state where violence was rampant, the State Department country condition report specifically described one incident in which local police in Guerrero arrested 43 students and then handed them over to drug traffickers. Only the remains of two of the students have been found. The ICG report described the same incident, as well as another kidnapping of "more than a dozen people" that occurred in Guerrero in May 2015, less than a year before Tomas's murder. The report concluded that the second kidnapping "shows that months after the students disappeared authorities remained unwilling or unable to act decisively to prevent and resolve such crimes." Similarly, Rosales characterized the police in Acapulco as being overwhelmed by organized crime, and the testimony of Rosales and his wife that they hired a private civil attorney to investigate Tomas's murder suggests that they shared this view of the inability of the police to bring criminals to justice.

Thus, while country condition reports generally have "high probative value . . . regarding a foreign country's conditions," Hang Chen v. Holder, 675 F.3d 100, 108 (1st Cir. 2012), and "may constitute 'substantial evidence' for the purposes of reviewing immigration decisions," id. (quoting Ambartsoumian v. Ashcroft, 388 F.3d 85, 89 (3d Cir. 2004)), the country condition reports here were particularly probative because they specifically addressed the failure of the police in Rosales's home state of

Guerrero to protect citizens from targeted kidnappings and murders committed by organized crime, and they corroborated Rosales's testimony regarding his first-hand experience with organized crime as a police officer. These reports supported the IJ's conclusion that the police were unable to protect Rosales from persecution, and the BIA erred by discounting them as too general.

**D.  Rosales's Failure to Report Threats to the Police**

In addition to conflating unwillingness and inability, the BIA made an additional error in its clearly erroneous analysis when it relied on the IJ's finding that Rosales did not report to the police the efforts of organized crime to find him in Acapulco and Pueblo Viejo as another basis for rejecting the IJ's inability finding. In so doing, the BIA ignored the proposition in our case law that "the failure by a petitioner to make [a police] report is not necessarily fatal to a petitioner's case [of persecution] if the petitioner can demonstrate that reporting private abuse to government authorities would have been futile." Morales-Morales v. Sessions, 857 F.3d 130, 135 (1st Cir. 2017). The BIA then compounded that error by failing to take into account the significant documentary evidence cited by the IJ showing police corruption and police complicity in organized crime in Guerrero. Rosales corroborated that evidence with his testimony that, in his experience as a police officer, the Acapulco police usually conduct an initial investigation when there is a crime but, "after that,

all that, it gets archived.  They don't really follow up with the cases."  Rosales also testified that, although the police find ten or eleven bodies every week in Acapulco, arrests are rarely made in those cases because "the organized crime is overwhelmingly more than the police."  The IJ's finding that Rosales sought assistance from an attorney outside the police department to investigate Tomas's murder further corroborated this testimony and the country condition reports.

Moreover, although he was a police officer, Rosales testified that he was "afraid" to speak to the police about his son's murder, and that he did not report the attempts to locate him by organized crime because he was "afraid they were going to kill us."  He also stated that "that's why the lawyer helped us to get all the paperwork . . . [for the asylum application], because we were afraid" to speak to the police.  Therefore, reviewing the entire record before the IJ, we conclude that the BIA erred when it decided that the IJ's inability finding was undermined by Rosales's failure to report the attempts to find him to the police. In citing that failure, the BIA did not address other evidence in the record demonstrating that such a report would be futile or even dangerous. Such a selective reading of the record by the BIA is a misapplication of the clearly erroneous standard.

**E.     Indistinguishable from Other Governments' Struggles**

The BIA also supported its clear error determination by concluding that any failure by the Mexican government to protect Rosales from organized crime "is [in]distinguishable from any other government's struggles to combat a criminal element," Burbiene, 568 F.3d at 255. Again, this selective reading of the record by the BIA reflects a misapplication of the clearly erroneous standard.

Drawing on the testimony of Rosales and country condition reports, the IJ found that most homicides and kidnappings in Guerrero go unsolved by police, and that at least some police officers in Guerrero are themselves involved with assisting organized crime in carrying out extortion, homicides, and even mass kidnappings. That evidence of police complicity in organized crime in the particular place where Rosales lived contrasts sharply with the evidence in Burbiene, where the country condition reports showed that the country had been largely successful in combatting human trafficking but had merely failed to eradicate the crime completely.[9]  See id.

---

[9] The government draws our attention to the Attorney General's recent decision in Matter of A-B-, 27 I. & N. Dec. at 320, which reiterated that "[t]he mere fact that a country may have problems effectively policing certain crimes . . . cannot itself establish an asylum claim." This description of the government nexus requirement is consistent with our precedent, discussed above, holding that a government's inability to protect a petitioner from

The government points out that there was some good news in the country condition reports, including Mexico's enactment of laws to facilitate the investigation of disappearances and torture. However, in light of the BIA's dismissal of the country condition reports altogether as too general, the government's attempt to now use them as support for the BIA's decision is unpersuasive. See Mejia, 756 F.3d at 69 (limiting appellate courts to review of "the reasoning provided by the agency"). As much as it might like to do so, the government cannot rewrite the BIA's decision.

Moreover, the examples provided by the government of the steps Mexico has taken to combat violence and police corruption through legislation show only the willingness of the government to enact laws, not the ability of the police to enforce the law. Indeed, the government concedes that the results of these efforts "have been 'limited.'" C.f. Burbiene, 568 F.3d at 255 (finding no showing of inability where, in addition to legislative changes,

_____

persecution must be "distinguishable from any other government's struggles to combat a criminal element." Burbiene, 568 F.3d at 255; see also Ortiz-Araniba, 505 F.3d at 41 (stating that a petitioner must show "more than 'difficulty . . . controlling private behavior'" (quoting Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005))). As we explain, Rosales has produced competent and sufficient evidence that the failures by the police in Guerrero went well beyond a government's failure to protect its citizens from all crime.

the government had "opened 24 criminal cases against alleged traffickers").

Even if the reforms cited by the government could be considered evidence of ability, we agree with the dissenting member of the BIA panel that the existence of some evidence in the record that could support a finding of ability does not render the IJ's finding of inability clearly erroneous, especially given the significant country condition evidence that supported the IJ's decision. See Ridore v. Holder, 696 F.3d 907, 917 (9th Cir. 2012) ("The BIA cannot, under a clear error standard of review, override or disregard evidence in the record and substitute its own version of reality."); see also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (stating that the clear error "standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently").

## III.

In sum, the BIA's justifications for its holding that it was clearly erroneous for the IJ to find that the Mexican government is unable to protect Rosales reflect multiple errors. The BIA failed to consider evidence of the Mexican government's inability to protect Rosales and his nuclear family, as distinct from evidence of the willingness of the police to investigate the murder of Rosales's son. That error in conflating unwillingness

- 28 -

and inability was compounded when the BIA discounted country condition reports which, when combined with Rosales's testimony about the particular circumstances of his case, were sufficient to support the IJ's finding that the police in Guerrero would be unable to protect Rosales from persecution by organized crime.

The BIA committed further error by concluding that the IJ's finding that Rosales did not report threats by organized crime to the police refuted the IJ's ultimate finding of inability. The BIA both ignored our precedent stating that a failure to report a crime does not undermine an assertion of inability if a report would have been futile, and failed to consider evidence in the record that would support a finding of futility, thereby misapplying the clear error standard. Moreover, in another misapplication of the clear error standard, the BIA incorrectly concluded that the IJ's inability finding was clearly erroneous because the Mexican government's failure to protect Rosales was indistinguishable from the struggles of any government to combat crime, when the record before the IJ supported a finding that it was distinguishable.

Because of these errors, we grant Rosales's petition and remand to the BIA for further proceedings consistent with this opinion. See I.N.S. v. Ventura, 537 U.S. 12, 16-17 (2002) (per curiam) (holding that remand to the BIA is generally the appropriate remedy when the BIA commits a legal error).

So ordered.