**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TRUNG VAN TRUONG; NGA THI LU;
MARTINA MY VAN TRUONG; PAOLO
VINH TUAN TRUONG,
                    *Petitioners,*

            v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 05-74666

Agency Nos.
A073-910-930
A073-910-931
A073-910-932
A073-910-933

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 8, 2010—Pasadena, California

Filed July 27, 2010

Before: Daniel M. Friedman,* Dorothy W. Nelson, and
Stephen Reinhardt, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Reinhardt

---

*The Honorable Daniel M. Friedman, United States Circuit Judge for
the Federal Circuit, sitting by designation.

## COUNSEL

Garish Sarin, Law Offices of Garish Sarin, Los Angeles, California, for the petitioners.

Peter Keisler, Mary Jane Candaux, and Patricia M. Bowman (on the brief), Jennifer L. Lightbody (argued), United States Department of Justice, Washington, D.C., for the respondent.

## OPINION

PER CURIAM:

Petitioners Trung Van Truong ("Mr. Truong") and his wife, Nga Thi Lu, are natives and citizens of Vietnam. Their children, Martina and Paolo Truong, who are also petitioners in this case, were born in Italy, but are not citizens of that country. All four family members have lived in the United States for almost 20 years.

Throughout their immigration proceedings, the Truongs have consistently been found to be credible. In his asylum application and in a hearing before an Immigration Judge (IJ), Mr. Truong established that he fought as a sergeant in the anti-communist South Vietnamese army in the Vietnam War. During the War, he was captured and tortured by communist guerrillas. After the North Vietnamese victory, he went into hiding and became an active member of an underground anti-communist organization. In April 1979, he and his wife escaped Vietnam. They stayed for a year in a United Nations-sponsored refugee camp in Malaysia before being admitted to Italy as refugees. They lived in Italy from 1980 until 1991, when they were granted non-immigrant visas and entered the United States, where they have remained ever since.

In 1995, the Truongs were charged with overstaying their visas, and were subsequently placed in deportation proceedings. They applied for asylum. The IJ granted their application. He was influenced in part by his finding that deportation would be "extremely traumatic" for the Truongs' two children, particularly Martina, whom the IJ described, after hearing her testimony, as "totally Americanized." The IJ was also concerned that, although the Truongs had been granted temporary refugee status in Italy, "the truth is that they cannot return to Italy." He found, and this court subsequently agreed, that by staying in the United States beyond the period permitted by the Italian government, the Truongs had lost their refu-

gee status in that country. Finally, the IJ was moved by the fact that Mr. Truong had fought on behalf of the United States-backed South Vietnamese Army. The IJ understood Mr. Truong's service on behalf of the United State's South Vietnamese allies to place some responsibility on the United States government to remedy, if possible, his family's subsequent statelessness.

The government appealed the IJ's decision. After the appeal had been pending for almost six years, Martina wrote to the BIA to inquire as to the status of her family's case. She asked that the BIA issue a final, favorable decision, so that she could regularize her immigration status in order to pursue an education at the University of California at Riverside, where she had been accepted as an undergraduate student. Shortly after receiving Martina's letter, in August of 2001, the BIA reversed the IJ's decision. It held that the Truongs were ineligible for asylum because they had firmly resettled in Italy, and ordered them to depart the United States within thirty days.

In 2003, this court granted the Truongs' petition for review of the BIA decision. *Truong v. INS*, No. 01-71507, 58 Fed. Appx. 315, 2003 WL 677843 (9th Cir. 2003) (unpublished disposition). We observed that the Truongs' credible testimony at their initial hearing had established that, about five years after arriving in Italy, they had begun receiving threats from Vietnamese communists living in the area. *Id.* Late at night, unidentified individuals had called their home and threatened to shoot them if they left the house. *Id.* On two separate occasions in 1991, Mr. Truong was shot at while driving his car at night. *Id.* He filed police reports on both occasions, but the police did nothing. *Id.* Shortly thereafter, fearing for their safety, the Truongs left Italy for the United States. *Id.* This court found that the foregoing facts "support[ed] a persecution claim" and remanded to the BIA "to consider whether the Truongs ha[d] shown persecution or a well-founded fear of persecution in Italy." *Id.*

On remand, a new IJ observed that the Truongs' case was "extremely sympathetic," and stated that he "would do anything in [his] power to grant their asylum case." At the conclusion of the hearing, the IJ offered to grant the Truongs a continuance so that they could accumulate additional evidence supporting their persecution claims, but the Truongs' counsel declined and requested an immediate decision.[1] The IJ granted the Truongs' application for withholding of removal to Vietnam, but found that the Truongs had failed to establish that the Italian government was unable or unwilling to protect them and, accordingly, denied their asylum application. The BIA affirmed.

As both of the IJs who have considered this case have concluded, the equities overwhelmingly favor the Truongs. In particular, Martina and Paolo, who were ten and two years old respectively when they entered the United States, are now twenty-nine and twenty-one years old. Moreover, the record shows that the Truongs are not able to return to Italy or Vietnam, the only countries — apart from the United States — to which they have any ties. When asked at oral argument whether the government had a country in mind to which they could be sent, counsel for the respondent stated that they would be sent to "whatever country would be willing" to have them. In light of these circumstances, we referred the case to mediation for exploration of any possibilities that would allow the Truongs to remain in the United States. Unfortunately, mediation has proven unsuccessful, and the parties have asked the panel to issue a decision on the merits. We do so now, and we DENY.

---

[1]It is inexplicable to us that the Truongs' counsel chose not to accept the IJ's offer, especially when the IJ suggested that supplementing the record "would help the Court and the Court would move most likely — if you persuade the Court, the Court would grant the asylum case." In denying the Truongs' asylum application, the IJ took special note that "[t]he respondent is unwilling to take the time to get the evidence" necessary to show past persecution.

We first reject the Truongs' contention that this court held in 2003 that the family suffered past persecution in Italy. In our prior disposition, we remanded the Truongs' persecution claims so that the BIA could "make the initial eligibility determination" — i.e., "consider whether the Truongs have shown persecution or a well-founded fear of persecution in Italy." 58 Fed. App. at 318 (citing *INS v. Ventura*, 537 U.S. 12 (2002) (noting that "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.")). The Truongs' assertion that we found past persecution, and that the IJ and BIA were powerless to subsequently find otherwise, is meritless.

We also find meritless the Truongs' assertion that the IJ found past persecution. Though the IJ did state that the Truongs suffered harassment in Italy rising to the level required to establish persecution, he clearly found the Truongs failed to show that "[t]he persecution [was] by the hands of the government or other group or person whose actions the government is unable or unwilling to control."

**[1]** We turn now to this finding and hold that it was supported by substantial evidence. "To establish past persecution, [aliens] must demonstrate that: (1) their experiences rise to the level of persecution; (2) the persecution was on account of one or more of the five protected grounds; and (3) the persecution was committed either by the government or by forces that the government was unable or unwilling to control." *Gormley v. Ashcroft*, 364 F.3d 1172, 1177 (9th Cir. 2004). Substantial evidence supports the IJ and BIA's conclusion that the harassment the Truongs faced in Italy was not "committed either by the government or by forces that the government was unable or unwilling to control." *Id.* Although the Truongs contend that their harassment came at the hands of communist forces, the record suggests that this contention is speculative. The Truongs simply cannot and do not know who their assailants were and what motivations they may have had. We also

note that the Truongs' professed belief that the Italian government was complicit in or unwilling to stop their harassment is undermined by the fact that the Truongs repeatedly sought assistance from the Italian police, who dutifully made reports after each incident and indicated that they would investigate. Without more, we are reluctant to infer government complicity or indifference from the mere fact that Italian police were unable to locate the Truongs' unknown assailants. *Cf. Singh v. I.N.S.*, 134 F.3d 962, 968 (9th Cir. 1998) ("[T]he police in the case at bar responded to Petitioner's location when she called them, but they took no further action. As the immigration judge noted, this could have been due to a lack of suspects, few leads, etc.").

**[2]** The few pieces of documentary evidence that the Truongs produced before the IJ are unavailing. At best, they show that ethnic minorities and immigrants living in Italy face sporadic violence and discrimination; they do not suggest that the Italian government is complicit in or unwilling to combat such discrimination. To the contrary, the 2003 State Department Country Report for Italy states that "[t]he Government generally respected the human rights of its citizens . . . [and] the law and judiciary provided effective means of dealing with individual instances of abuse." We, thus, hold that the record before us is not so overwhelming that "a reasonable factfinder would be compelled to conclude," *Gormley*, 364 F.3d at 1176, that the Truongs faced past persecution at the hands of the Italian government or forces that the Italian government was unable or unwilling to control.

**DENIED.**

---

REINHARDT, Circuit Judge, concurring:

I concur in the per curiam opinion. It is most unfortunate, however, that we are compelled to affirm the Board of Immi-

gration Appeals in this case. Under current Supreme Court law, we have no choice but to agree that the government has the legal authority to deport a young college student, who was brought to this country as a child by her parents and raised here in the same manner as all other law-abiding young people. To all appearances, she was an ordinary American child seeking a good education. When, in order to continue her education at the University of California, she wrote to the BIA and asked what had happened to the appeal that the government had taken from the Immigration Judge's ruling in her parents' favor six years earlier, the BIA ordered her and her family deported. She was twenty years old at the time. Her brother, who was two years old when he entered this country, was then twelve. He had also grown up in this country as a law-abiding youth, with law-abiding parents who fought on our side during the Vietnam War. The only mistake made by anyone in the family was committed by the parents who had fled Vietnam after we lost the war, had gone to Italy, which they then fled after being harassed and shot at by people they suspected of being Communists, and finally had come to the United States with their young children. Their mistake was in overstaying their visas in the belief that they had finally found peace and freedom for their family.

The prospect of deporting Martina Truong, a college student who was described by the Immigration Judge as "totally Americanized" and "a highly sensitive child of superior intelligence," and who according to the judge would be "extremely traumati[zed]" by the government's proposed action must be highly offensive to those who adhere to America's fundamental values. So must the prospect of deporting her brother who was a baby when the Truongs arrived here and who, at twelve, knew life in no other country. Martina and her brother are not the only young people who face such harsh treatment at the hands of our immigration authorities. A number of college students and others with spotless records who grew up in this country will, if treated justly, remain here and

make significant contributions to what they consider to be their homeland. If they are deported, we will be the losers.

The per curiam opinion clearly explains why the equities in this case overwhelmingly favor the Truongs. I write separately to emphasize that although we as judges do not have the authority to grant the Truongs' petition for review, immigration officials retain considerable discretion to achieve a just result for the Truong family and others in their situation.

It is neither possible nor desirable to deport every person in this country who is undocumented, and it is difficult to understand the government's decision to appeal the initial Immigration Judge's grant of asylum in order to vindicate a position that, while technically justified, leads to a wholly unfair and undesirable result. The first Immigration Judge to hear the case unhesitatingly granted relief to the entire Truong family. The second — the first had moved to another state — said, "This Court is extremely sympathetic to the Truongs and this Court would do anything in its power to grant their asylum case."

The Truongs have been granted withholding of deportation from Vietnam. Although that form of relief does not *prevent* the government from deporting them to a country other than Vietnam, it also does not *require* that the government do so, especially when, as the government acknowledged at oral argument, it has no idea where to send them and, if it finally figures it out, it will have to be a country in which none of the Truongs has ever previously resided and in which, almost certainly, none knows how to speak the language (unless once again Palau comes to the rescue). Any Department charged with the responsibility of enforcing or administering the law must understand the importance of establishing priorities, and any such decision must be implemented not just at the top, but throughout the Department. There are many undocumented individuals, especially those who have committed serious crimes, who are far more deserving of deportation by the

immigration authorities than are the young members of the Truong family, or even their parents. I would hope, and I'm sure that my colleagues would join me, that immigration officials will take into account the priorities essential to the orderly implementation of the law and the equitable considerations that fairness demands when determining how to proceed in the wake of the decision we are compelled to issue today.