FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| J.R., *Petitioner*, | No. 18-72812 |
| v. | Agency No. A216-271-552 |
| WILLIAM P. BARR, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 6, 2020
Seattle, Washington

Filed September 11, 2020

Before: Andrew J. Kleinfeld, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Rawlinson

## SUMMARY[*]

### Immigration

Granting JR's petition for review of the Board of Immigration Appeals' decision affirming an immigration judge's denial of asylum and withholding of removal, and remanding, the panel held that substantial evidence did not support the Board's conclusion that the El Salvadoran government was both able and willing to control the Mara-18 gang whose members attacked JR and killed his son.

The panel held that the record before the IJ and Board compelled the conclusion that, despite initial responsiveness to JR's complaints, the police were unable, and then unwilling, to protect JR and his family from the Mara-18 gang. The panel recounted that after a gang member cut off two of JR's fingers, and the gang member was briefly imprisoned after JR reported the crime, gang members shot JR seven times, causing him to lose one of his lungs. A few months later, the gang murdered JR's son at home, and after reporting the murder and agreeing to cooperate with prosecutors, JR received a death threat from the local "boss" of the gang. Although the government provided protection before JR gave his testimony, it withdrew that protection after he testified. Soon thereafter, JR and his family fled the country. The panel concluded that, given its withdrawal of protection, the El Salvadoran government was, in fact, "unwilling to protect" JR.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel explained that the undisputed factual record before the IJ and Board reflected actual deadly violence that the government was, during certain periods, unable to control, and threats of additional deadly violence that the government was entirely unwilling to control after JR testified. The panel stated that this was enough to show government unwillingness and inability to control the gang. The panel noted that the law does not require applicants to wait until gang members carry out their deadly threats before they are eligible for asylum.

Because the Board did not reach the questions of whether JR was a member of a particular social group, or whether he suffered harm rising to the level of persecution, the panel remanded for the Board to address those issues in the first instance.

Judge Rawlinson dissented reluctantly because, in her view, the stringent standard of review under which this court must resolve these cases does not permit the result reached by the majority. Judge Rawlinson wrote that the majority did not, and cannot, cite a case from this circuit concluding that the panel was compelled to conclude that a country was unwilling to provide protection in the face of similarly extensive police and prosecutorial responses as occurred in this case. Judge Rawlinson wrote that the majority made much of the fact that the government did not continue protective custody for JR's family indefinitely after the trial concluded, but she noted that protective custody is not the only means of manifesting a willingness or ability to protect

citizens, and that the fact remains that JR and his family were not harmed in any way during the period following the trial until they left the country.

**COUNSEL**

Eva Sharf (argued) and Malori M. McGill (argued), Certified Law Students; Elizabeth G. Porter (argued) and Jeffrey M. Feldman (argued), Faculty Advisors; Ninth Circuit Appellate Advocacy Clinic, University of Washington School of Law, Seattle, Washington; for Petitioner.

David Kim (argued) and David J. Schor, Trial Attorneys; Kohsei Ugumori, Senior Litigation Counsel; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

W. FLETCHER, Circuit Judge:

JR petitions for review of the denial of his application for asylum and withholding of removal. The Immigration Judge ("IJ") denied relief on the ground that JR had failed to show that the government of El Salvador was "unwilling or unable" to control his alleged persecutors. The Board of Immigration Appeals ("BIA") affirmed on the same ground. We hold that substantial evidence does not support the BIA's conclusion. We grant the petition and remand for further proceedings consistent with this opinion.

## I. Background

## A. Factual Background

JR's hearing before the IJ was conducted by video. At the time of his hearing, JR was incarcerated in Tacoma, Washington. He appeared without an attorney. The IJ and the government attorney were in San Diego. Because the IJ found JR to be a credible witness, we take as the true the following narrative based on JR's testimony.

JR and his common-law wife lived in El Salvador with their children until 2017. The family began experiencing problems with the Mara-18 gang in 2012, when JR's nephew, a member of the gang, cut off two of JR's fingers. JR reported the incident to police, and the nephew was arrested and spent five months in jail. In January 2016, gang members shot JR seven times. He lost his right lung as a result. Six months later, a group of nine gang members shot and killed JR's son on the front porch of JR's home. JR's family filed a police report, naming the local leader of the Mara-18 gang and the gang leader's brother as members of the group.

In November and December of 2016, the police detained three gang members involved in JR's son's murder, including the local gang leader and his brother. Despite the risks, JR agreed to proceed with the case and testify as a witness in their criminal trials. He told the IJ:

> [T]he boss of [Mara-18] wanted me to go and remove the report that I did, that I filed of my son's death, and I didn't want to do that. I told him that this was not a game, this was not

> a movie that he had done. I told him it was a
> death. It was a homicide, a murder. And I
> told him to be a man and to be in jail because
> it was not a game what he had done. So then
> he said—so you will die, he told me.

Gang members pressured JR to withdraw his report so that the arrested members would be released. JR refused. Because of the danger to JR and his family, the prosecutor's office relocated JR's family to a different town, Usulután, while JR stayed behind to testify.

The trial judge warned JR "to leave, to get out of there." With the help of police and the prosecutors' office, JR joined his family in Usulután in July 2017 after testifying. Shortly thereafter, the government withdrew its protection of JR and his family. Fearing the gang, JR and his family fled El Salvador in September 2017.

JR, his partner, and their two surviving children arrived at the San Ysidro, California port of entry in December 2017. JR immediately requested asylum on behalf of himself and his family, citing fear of the Mara-18 gang, which was "looking for [him] every day to kill [him]."

After the trial in El Salvador, the three gang members were convicted and sentenced. Two other gang members involved with the murder of JR's son were shot and killed by the police in December 2016. The remaining four gang members involved in the murder have fled to the United States. However, the gang remains powerful in El Salvador. The IJ asked JR, "Why are you afraid to go back?" JR responded, "Because upon arrival, I'm going to be dead."

### B. Proceedings Below

JR was issued a Notice to Appear charging him with being removable as a noncitizen without valid entry documents at time of admission. JR conceded removability at his hearing. The IJ found JR to be a credible witness but denied his claims for asylum, withholding of removal, and relief under CAT.

The IJ said in his oral decision, "The Court also notes there is case law, *Henriquez-Rivas* . . . that a witness in a criminal case could possibly be a particular social group." But the IJ declined to decide whether JR was member of a particular social group. The IJ denied relief solely on the ground that JR had not shown that the El Salvadoran government was unwilling or unable to protect him. The IJ cited as support the fact that the police had arrested JR's nephew; that the government had arrested, tried, and convicted three gang members involved in his son's murder; and that the police had killed two others. The IJ also relied on JR's participation in what the IJ called a "witness protection program"—referring to the relocation of JR and his family to Usulután—as showing the government's willingness and ability to protect JR. Finally, the IJ cited examples in the country report of the El Salvadoran government "strik[ing] blow[s] against gang[s] in operation." The IJ held that because JR failed to show government unwillingness or inability for purposes of asylum, he necessarily failed to make the more stringent showing for withholding of removal.

After the IJ announced his oral decision denying relief, JR said, "Well, this is the judge, but what can we do? I mean I'm going to have to die."

The BIA affirmed the denial of relief. It relied on the same ground as the IJ, citing the facts of JR's nephew's arrest; the arrest, conviction, and killing of gang members involved in JR's son's murder; and the fact that JR's "family was placed in a witness protection program." The BIA did not reach the questions whether JR was a member of a particular social group and whether JR had suffered harm rising to the level of persecution.

JR timely petitioned for review of the BIA's denial of asylum and withholding of removal. He has not petitioned for review of its denial of CAT relief.

JR moved in this court for a protective order allowing redaction of his name from court documents to ensure his safety from the gang. In a sworn declaration in support of his motion, JR recounted that after the trial he had moved to Usulután to live with his wife's uncle, who is a policeman. Soon thereafter, the gang discovered JR was in Usulután. It began threatening the uncle's family and offered a $500 reward for the murder of JR. JR fled for the United States after the uncle told him to leave. When JR reached Mexico, he learned that Mara-18 had attacked the uncle and had killed the uncle's brother. The three men convicted of the murder of JR's son have also been released from prison. Based on JR's declaration, we granted the motion to redact his name.

## II. Legal Standard

We review the agency's legal conclusions de novo and its factual findings for substantial evidence. *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc). A finding is not supported by substantial evidence when "'any reasonable adjudicator would be compelled to conclude

to the contrary' based on the evidence in the record." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Where, as here, the BIA "adopt[s] and affirm[s] the decision of the IJ but also adds its own analysis, the scope of our review extends to the decisions of both the IJ and the BIA." *Wakkary v. Holder*, 558 F.3d 1049, 1056 (9th Cir. 2009) (alteration in original) (internal quotation marks and citation omitted).

### III.  Discussion

### A.  "Unable or Unwilling"

"In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir. 2000) (footnotes and internal quotation marks omitted); 8 U.S.C. § 1101(a)(42)(A).  The BIA and IJ declined to address the first two requirements and denied relief based on the third requirement alone.

For the reasons that follow, we hold that substantial evidence does not support the BIA's conclusion that the El Salvadoran government was both able and willing to control the Mara-18 gang whose members attacked JR and killed his son.

Because the Mara-18 gang members are nongovernmental actors, JR must show that the El Salvadoran government is "unable or unwilling" to control them. *See Doe v. Holder*, 736 F.3d 871, 877–78 (9th Cir. 2013); 8 U.S.C. § 1101(a)(42)(A).  The BIA focused on the government's

responses to JR's complaints, such as arresting his nephew and relocating JR's family after JR agreed to testify against the gang members.

Some official responsiveness to complaints of violence, although relevant, does not automatically equate to governmental ability and willingness. "Even if [an applicant's] ability to file a police report suggests that the police were *willing* to protect [him], that says little if anything about whether they were *able* to do so." *Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010), *overruled on other grounds by Bringas-Rodriguez*, 850 F.3d at 1070. Willingness to control persecutors notwithstanding, authorities may nevertheless be "powerless to stop" them because of a "lack of . . . resources or because of the character or pervasiveness of the persecution." *Id.* We have previously held, for example, that the BIA erred by "focus[ing] only on the Mexican government's willingness to control Los Zetas, not its *ability* to do so." *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013). Conversely, authorities may simply be *unwilling* to control persecutors, where, for instance, they themselves harbor animus towards a protected group. *See, e.g.*, *Korablina v. INS*, 158 F.3d 1038, 1045 (9th Cir. 1998) ("[T]he police, known as the militia, are a part of the same ultra-nationalist and anti-Semitic group, and . . . the State does not make any effort to protect Jews or to stop anti-Semitism."); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1121–22 (9th Cir. 2004). In other words, the question on this step is whether the government both "could *and* would provide protection." *Rahimzadeh v. Holder*, 613 F.3d 916, 923 (9th Cir. 2010) (emphasis added).

The record before the IJ and BIA compels the conclusion that, despite initial responsiveness to JR's complaints, the

police were unable, and then unwilling, to protect JR and his family from the Mara-18 gang. After a gang member cut off two of his fingers, JR reported the crime, and the member was briefly imprisoned. However, after that incident, gang members shot JR seven times. JR survived, but lost one of his lungs. A few months later, the gang murdered JR's son at home. After reporting the murder and agreeing to cooperate with prosecutors, JR received a death threat from the local "boss" of the gang. Although the government provided protection before JR gave his testimony, it withdrew that protection after he testified.

Had the government been willing to continue to provide effective protection, JR would have lacked a viable claim, for the government would have been both willing and able to protect him. But the question is whether the government both "could *and* would provide protection" from private persecutors. *Rahimzadeh*, 613 F.3d at 923 (emphasis added). Even if the government *could* protect JR and his family, it is undisputed that, after JR finished testifying, it no longer *would* do so. Given its withdrawal of protection, the El Salvadoran government was, in fact, "unwilling to protect" JR. *Afriyie*, 613 F.3d at 931.

Two months after the government refused to provide protection, JR fled the country with his family. While the family was not harmed by the gang during those two months, "a post-threat harmless period need not vanquish an asylum claim, particularly where significant evidence suggests that the threats are becoming more menacing." *Kaiser v. Ashcroft*, 390 F.3d 653, 659 (9th Cir. 2004) (quoting *Lim v. INS*, 224 F.3d 929, 935 (9th Cir. 2000)). In *Kaiser*, we found that petitioners who had received death threats for thirteen years—"none of [which] had been carried out"—still carried

their burden to show government inability and unwillingness. *Id.* There, petitioners had shown that the threats had increased in frequency and severity, one of the petitioner's colleagues had been murdered, and documentary evidence illustrated the persecutor's "willingness to use violence to further its objectives." *Id.*; *see also Lin*, 224 F.3d at 935 (petitioner's failure to flee for six years after the first death threat did not defeat asylum claim).

As in *Kaiser*, the country conditions evidence supports JR's undisputed testimony about gang members' "willingness to use violence to further [the gang's] objectives." *Kaiser*, 390 F.3d at 659. As a May 2016 news story in the record reports, the Supreme Court of El Salvador designated the Mara-18 gang as a "terrorist organization" just months before the murder of JR's son. It further notes that the government's strategy against the gangs "has so far failed to pay security dividends." At about the time JR and his family suffered their attacks, El Salvador "became the most homicidal nation . . . in the world not at war." The country conditions report notes that "more than one in five families claim to have been victims of violent crimes," and that "[i]n many neighborhoods, armed groups and gangs targeted certain persons, interfered with privacy, family, and home life, and created a climate of fear that the authorities were not capable of restoring to normal."

The government argues that the protection provided to JR and his family "confirms that the government is neither unable nor unwilling to extend protection." The government cites *Doe v. Holder*, 736 F.3d 871 (9th Cir. 2013), contending that it held that an "applicant fails to carry his burden where, as here, police take reports and indicate that they will investigate an alleged crime." *Doe* did not so hold. *Doe* held

instead that "where the asylum applicant failed to provide the police with sufficiently specific information to permit an investigation or an arrest," the police's inability to solve a crime does not show government inability or unwillingness to control persecutors. *Doe*, 736 F.3d at 878; *see also Afriyie*, 613 F.3d at 931 (taking of report by police does *not* show government ability). Other cases cited by the government are unhelpful to the government for this reason. *See, e.g.*, *Truong v. Holder*, 613 F.3d 938, 941 (9th Cir. 2010) (petitioners did not know "who their assailants were and what motivations they may have had"); *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 (9th Cir. 2005) (petitioner did not give police names of any suspects).

Here, JR filed a police report after a gang member cut off two of his fingers. Members of the gang thereafter shot JR seven times, and then shot and killed JR's son on the front porch of his house. When JR refused to withdraw a police report after the death of his son, the "boss" of the gang warned JR: "So then he said—so you will die, he told me." Gang members were "looking for [him] every day to kill [him]." When JR testified against the gang members in open court, resulting in their eventual conviction and imprisonment, the El Salvadoran judge urged him to flee. It is undisputed that the El Salvadoran government withdrew its protection from JR and his family after he testified. Soon thereafter, JR and his family fled the country.

Our dissenting colleague lists several actions of the El Salvadoran government, concluding that JR has not shown that the government was either unwilling or unable to protect him. However, the dissent focuses solely on the government's protection during the time leading up to JR's testimony. It ignores the fact that after JR finished testifying

in support of the prosecution, the government was no longer willing to protect him.

The undisputed factual record that was before the IJ and BIA reflects actual deadly violence that the government was, during certain periods, unable to control, and threats of additional deadly violence that the government was entirely unwilling to control after JR testified. This is enough. Our law does not require applicants to wait until gang members carry out their deadly threats before they are eligible for asylum. Substantial evidence does not support the BIA's determination otherwise.

### B.  Particular Social Group and Harm Rising to the Level of Persecution

JR, like the petitioner in *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc), is an El Salvadoran witness who testified in court against gang members. We held in *Henriquez-Rivas* that such persons are members of a particular social group, given "significant evidence that Salvadoran society recognizes the unique vulnerability of people who testify against gang members in criminal proceedings." *Id.* at 1092.

We have held that far less serious harm than that JR suffered rises to the level of persecution. *See, e.g.*, *Surita v. INS*, 95 F.3d 814, 819–20 (9th Cir. 1996) (holding petitioner established past persecution where she had been robbed multiple times over the course of one week); *Artiga Turcios v. INS*, 829 F.2d 720, 722–24 (9th Cir. 1987) (holding petitioner established past persecution where neighbor relayed men had been looking for him and "warned him to leave because he might be killed"); *Mihalev v. Ashcroft*, 388

F.3d 722, 729 (9th Cir. 2004) (holding petitioner established past persecution where he was jailed for ten days and beaten, but had not "suffered a significant injury"); *see also Baballah v. Ashcroft*, 367 F.3d 1067, 1074, 1076 (9th Cir. 2004) ("Threats and attacks can constitute persecution even where an applicant has not been beaten or physically harmed. . . . An applicant may suffer persecution because of the cumulative impact of several incidents even where no single incident would constitute persecution on its own.").

However, the BIA did not reach the questions whether JR is a member of a particular social group or whether he suffered harm that rises to the level of persecution. Under *INS v. Ventura*, we cannot ourselves decide those questions in the first instance. 537 U.S. 12, 16–18 (2002) (per curiam). We are therefore obliged to remand JR's petition to the BIA for further proceedings.

JR was incarcerated from the date of his arrival in the United States in December 2017 until May 2020, waiting for his application to be adjudicated. He has recently been released after being determined, based on his medical records, to face a "higher risk of serious illness due to COVID-19." Dkt. No. 45. We are not in a position to dictate the manner and speed in which JR's application is handled on remand. However, given the circumstances of this case, we encourage the government and the BIA to act expeditiously in resolving the issues that remain.

Conclusion

We hold that substantial evidence does not support the BIA's conclusion that the El Salvadoran government is willing and able to control the Mara-18 gang that attacked JR

and killed his son, and that continues to be a threat. We grant JR's petition and remand for further proceedings consistent with this opinion.

**Petition for review GRANTED and REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I reluctantly dissent because the stringent standard of review under which we must resolve these cases does not permit the result reached by the majority. As the majority acknowledges, we may grant relief on a petition for review of a Board of Immigration decision "only if the evidence *compels* a contrary conclusion from that adopted by the BIA." *Afriyie v. Holder*, 613 F.3d 924, 931 (9th Cir. 2010), *overruled on other grounds in Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069 (9th Cir. 2017) (en banc), (citation omitted) (emphasis added).

I take no issue with the majority's articulation of this stringent standard. The problem is with the majority's failure to actually apply this standard to the facts before us.

The pivotal question in this case was whether El Salvadoran officials were willing and able to protect JR and his family. The record and the law compel us to answer "yes" rather than "no."

It is beyond dispute that JR and his family suffered horrendous harm at the hands of gang members in El Salvador. The government does not dispute that fact. Neither does the government contend that these horrendous events did

not rise to the level of persecution. The government's only contention is that the El Salvadoran government was willing and able to protect J.R. and his family.

It is undisputed that the El Salvadoran government took the following actions in response to J.R.'s report of the crimes perpetrated against him and his family:

- Arrested and incarcerated J.R.'s gang member nephew after he cut off two of J.R.'s fingers.

- Arrested, prosecuted, convicted, and incarcerated three gang members involved with the murder of J.R.'s son.

- Killed in a shoot-out two other gang members involved with the murder of J.R.'s son.

- Relocated J.R. and his family pre-trial and post-trial.

- Caused four of the gang members involved with the murder of J.R.'s son to flee to the United States.

Despite these substantial and effective actions taken by the El Salvadoran government, the majority takes the position that a reasonable adjudicator would nevertheless be compelled to conclude that the El Salvadoran government was unwilling or unable to protect J.R. and his family.

This would be a different case if gang members stormed the location where J.R. and his family were being held and dragged them out them out at gunpoint, or if the government refused to apprehend and prosecute the perpetrators, or if gang members continued to terrorize J.R. and his family after

he testified against the gang members. But that is not what happened in this case. Indeed, J.R. and his family remained unmolested following the trial until they left for America. As we recognized in *Afriyie*, "the authorities' response (or lack thereof) to . . . requests [for protection] may provide *powerful evidence* with respect to the government's willingness or ability to protect the requestor." *Id.* (citation omitted) (emphasis added). The clear implication of this language is that an affirmative response connotes a willingness and ability to protect the individual requesting protection. Conversely, the lack of a response signals an unwillingness and inability to protect. *See id.* Under our expressed rationale in *Afriyie*, the significant affirmative actions taken by the El Salvadoran government in response to J.R.'s report of the horrendous crimes committed against him and his family by gang members constitute "powerful evidence with respect to [El Salvador's] willingness and ability to protect [J.R. and his family]." *Id.*

In *Afriyie*, we described the circumstances reflecting a government that was unwilling and unable to protect an asylum applicant. We observed that "an inability to provide protection may arise because of a lack of financial and physical resources." *Id.* (citation omitted). Specifically, in *Afriyie's* case, we noted that "the Ghanaian police forces lacked the resources necessary to protect [Afriyie]." *Id.* at 932. The police force only had one gun "for the entire [police] station" and "expected individuals reporting crimes to track down and bring in the perpetrators." *Id.* That two murders were reported to the police, "with no apparent progress in solving them, is highly relevant evidence to the question whether Ghanaian authorities were unable, even if willing, to protect Afriyie." *Id.* By the same token, the extensive and effective efforts on the part of El Salvadoran

police officials on behalf of J.R.'s family is "highly relevant evidence" that the El Salvadoran authorities were willing and able to protect J.R. and his family. *Id.* At bottom, the scenario in *Afriyie* is a far cry from the circumstances presented to us.

Neither are the other cases cited by the majority analogous to the facts in this case. In *Doe v. Holder*, 736 F.3d 871, 878 (9th Cir. 2013), we referenced our decision in *Mashiri v. Ashcroft*, 383 F.3d 1112, 1115 (9th Cir. 2004). We recounted that in *Mashiri*, the evidence in the record "compelled the conclusion that the government was unable or unwilling to protect the applicant where police investigated but made no arrests after the applicant's husband was beaten." *Id.* We noted that the police in *Mashiri* "quickly closed their investigation into the attack on her family's apartment as simple theft, despite evidence that the attack was motivated by anti-foreigner hatred." *Id.* at 878–79.

We then likened the facts in *Mashiri* to those in *Doe*, observing that the "police rejected [Doe's] first complaint out of hand, questioning why he did not simply defend himself." *Id* at 879. The police summarily dismissed his second request for assistance "without doing anything more than interviewing him at the hospital" despite substantial evidence that both assaults "were motivated by anti-homosexual bias." *Id.*

The lackadaisical police efforts described in *Mashiri* and *Doe* bear no resemblance to the targeted, sustained response by the El Salvadoran police in response to J.R.'s reports of the violence perpetrated against him and his family. Understandably, the panels in *Afriyie*, *Mashiri* and *Doe* could reasonably and easily determine that they were compelled to

conclude that the police were not willing and able to protect the asylum seekers in those cases. *See, e.g.*, *Afriyie*, 613 F.3d at 934 ("Given this state of the credited record, any reasonable factfinder would be compelled to conclude that the Ghanaian police were unable or unwilling to protect Afriyie. . . ."). But the stark difference in the response of the El Salvadoran police in this case renders the outcomes in those cases readily distinguishable.

In *Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013), a case that also involved a violent gang, the underlying facts presented a stark contrast to those before us. The panel in *Madrigal* remanded to the BIA for a determination whether Mexican authorities were able to control a gang called Los Zetas. The panel questioned the Mexican government's willingness to control the gang due to the "continu[ing] . . . problem" of "corruption at the state and local levels," despite the "superior efforts of the Mexican government at the national level." *Id.* at 507. The panel also referenced the fact that "[m]any police officers are involved in kidnapping, extortion, or providing protection for, or acting directly on behalf of, organized crime and drug traffickers." *Id.* (citation and internal quotation marks omitted). This widespread corruption led to "the continued reluctance of many victims to file complaints." *Id.* (internal quotation marks omitted). Finally, the panel noted the "rampant" corruption among prison guards, resulting in prisoners "break[ing] out of prison with the guards' help." *Id.* (citation omitted). Once again, the facts relied upon by the panel to cast doubt on the Mexican government's ability to control the gang are not reflected in the facts of this case involving El Salvadoran officials who responded emphatically to apprehend, prosecute, and incarcerate the gang members involved in the heinous crimes perpetrated against J.R. and his family.

In sum, the majority does not, and cannot, cite a case from this circuit concluding that the panel was compelled to conclude that a country was unwilling to provide protection in the face of similarly extensive police and prosecutorial responses as occurred in this case. The majority makes much of the fact that the government did not continue protective custody for J.R.'s family indefinitely after the trial concluded. However, protective custody is not the only means of manifesting a willingness or ability to protect citizens and nothing in our precedent supports such a requirement. *Cf. Truong v. Holder*, 613 F.3d 938, 941 (9th Cir. 2010) (explaining that the argument that the government was unwilling or unable to control the persecutors was "undermined by the fact that [the petitioners] repeatedly sought assistance from the . . . police, who dutifully made reports after each incident and indicated that they would investigate"). And the fact remains that J.R. and his family were not harmed in any way during the period following the trial until they left the country. Although I am extremely sympathetic to the plight of J.R. and his family, our standard of review does not permit the relief granted by the majority. I respectfully dissent.