# United States Court of Appeals
## For the First Circuit

No. 24-2117

JOHN RESTREPO CASTANO; DIANA LOPEZ VALENCIA; and M.R.L.,

Petitioners,

v.

PAMELA J. BONDI, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Lipez and Rikelman, Circuit Judges.

Ronald L. Abramson, with whom Shaheen & Gordon, P.A. was on brief, for petitioners.

John F. Stanton, Trial Attorney, Office of Immigration Litigation, Civil Division, with whom Yaakov M. Roth, Acting Assistant Attorney General, Civil Division, and John S. Hogan, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

November 26, 2025

**RIKELMAN, <u>Circuit Judge</u>.** A criminal gang issued multiple death threats to Jhon Eduardo Restrepo Castano and his family while he was working in his bakery in Colombia. After he reported the conduct to the authorities, the police stationed a guard at his workplace. Although the in-person death threats ended, the criminal gang continued the threats by phone. Fearful for their safety, Castano and his family fled to the United States in 2022 and eventually sought asylum and withholding of removal.[1] An Immigration Judge (IJ) found that Castano did not qualify for these forms of relief because he could not establish that the Colombian government was unwilling or unable to protect him from the gang, and thus he could not demonstrate a government connection to the harm he had experienced. The Board of Immigration Appeals (BIA) affirmed the IJ's decision and dismissed Castano's appeal.

Castano now seeks this court's review, arguing primarily that the IJ and BIA (together, "the agency") erred in finding that the Colombian government was able to protect him from the criminal gang. Because we conclude that substantial evidence supports the agency's decision, we deny Castano's petition.

---

[1] Castano's wife and child are listed as derivative beneficiaries on his asylum application. Our disposition of Castano's application also resolves their derivative applications. <u>See</u> <u>Cabrera</u> v. <u>Garland</u>, 100 F.4th 312, 315 n.1 (1st Cir. 2024).

## I. BACKGROUND

### A. Relevant Facts[2]

Jhon Eduardo Restrepo Castano was born in Medellín, Colombia.[3]  In 2019, Castano opened his own bakery in the nearby city of Don Matías.  A year later, in 2020, Castano was working at his bakery when he first received a phone call from the Gulf Clan. The Gulf Clan, or Clan de Golfo in Spanish, is a violent Colombian criminal enterprise involved with drug dealing and money laundering.  The gang members warned Castano that he had to cooperate with the gang by providing monetary and political support, or else they would kill his wife and child.  Gulf Clan members subsequently called Castano multiple times, and in each conversation, they threatened Castano, his wife, and his child if he did not provide material support to their organization.  Castano never paid or otherwise supported the Gulf Clan.

In September 2021, two armed Gulf Clan members wearing motorcycle helmets descended on Castano's bakery and warned

---

[2] "We draw the relevant facts from the administrative record," including "testimony before the IJ . . . [that] the IJ found to be credible and corroborated."  Barnica-Lopez v. Garland, 59 F.4th 520, 525 n.1 (1st Cir. 2023) (citing Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022)).

[3] In his petition for review, Castano explains that his legal name is "Jhon," but that "he is using the anglicized spelling of his first name as it is reflected in the administrative record." We maintain the spelling as "John" in the case caption, but use Castano's legal name in this opinion.

Castano that they would kill him and his family if he did not comply with the gang's demands or leave the area. Fearful, he filed a complaint with the police.

The police assigned a "guard" who would "spend all day at [Castano's] business until [Castano] would leave to go home."[4] The police also investigated Castano's complaint, but he never received "a response or any answer about that." Additionally, the police "blocked" the "phone lines" of Castano and his family members so they "could not receive more calls" from the gang.

Although the Gulf Clan did not menace Castano in person again, gang members continued the telephonic threats from different phone numbers. At his hearing before the IJ, Castano testified that he informed the police about the ongoing calls, and to his knowledge, the police did not take any additional action. But during the federal government's cross-examination, Castano admitted that he could not recall whether he reported these continued calls to the authorities after the police stationed a guard at his bakery. Castano also acknowledged that from the time the threats started, the gang never physically harmed him or his

---

[4] Castano testified that the police sent a "companion," and he repeatedly used the term "companion" throughout his brief. Castano's affidavit, however, states that he was given "a police guard." Further, the police commissioner's supporting affidavit indicates that the police "sent over a police officer as a guard."

family.  Nevertheless, feeling unsafe, Castano and his family fled to the United States in March 2022.

## B. Procedural History

Castano and his family entered the United States without inspection and proceeded to Massachusetts, where they were discovered by immigration authorities.  On April 6, 2022, the Department of Homeland Security served substantively identical Notices to Appear on Castano and his family members, initiating removal proceedings.  Castano then applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

In his testimony before the IJ, Castano recounted the Gulf Clan's death threats against him and his family.  The IJ found that Castano "testified credibly," noting that his testimony "was generally consistent with his affidavit and his application." Additionally, the IJ explained that Castano submitted some corroborating evidence, including "a statement or letter from the police chief," and made efforts to obtain additional corroborating documents, such as the police reports.  Thus, the IJ credited Castano's testimony and affidavit.

Nevertheless, the IJ determined that Castano had not met his burden of establishing a government connection to any persecution he had faced in Colombia. As the IJ explained, because the Gulf Clan was a private entity, not controlled by the

government, Castano could demonstrate persecution only if he could show that Colombia "was unwilling or unable to assist him" in responding to the gang's threats. In particular, the IJ noted that the police "took a somewhat extraordinary step of providing on-site police protection," which showed the government's willingness to protect Castano. The IJ also found that the Colombian government was able to protect Castano and that it had the resources to do so. Bolstering this conclusion, the IJ highlighted that the in-person threats stopped after the police sent a guard to Castano's bakery and that although the telephonic threats continued, those threats "were never acted upon, nor was there any apparent attempt to act on those [] threats." Thus, the IJ concluded that Castano was not eligible for asylum. She then denied Castano's request for withholding of removal because that form of relief also required Castano to establish a government nexus to any persecution.[5]

Castano appealed the IJ's decision, but the BIA "dismiss[ed] the appeal," "discern[ing] no clear error in the [IJ's] determination" that "the actions of local authorities demonstrate[d] [Colombia's] willingness and ability to protect"

---

[5] In assessing Castano's asylum request, the IJ considered and rejected Castano's argument that the Gulf Clan operates as a quasi-governmental organization. Additionally, the IJ denied Castano's request for protection under the CAT. Castano does not challenge either of these rulings.

- 6 -

Castano and his family. Given that assessment, the BIA concluded that Castano "did not establish that the Colombian government was or will be unable or unwilling to protect [him and his family in the future] from the threats he [had] experienced." The BIA also agreed that because Castano did not meet his burden of proof for asylum, he could not satisfy the more stringent standard for withholding of removal.

Castano timely filed a petition for review.

## II. STANDARD OF REVIEW

"In immigration cases, our review 'typically focuses on the final decision of the BIA.'" Khalil v. Garland, 97 F.4th 54, 61 (1st Cir. 2024) (quoting Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020)). "But 'to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision' as well." Id. (quoting Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022)). When we review the BIA's and IJ's decisions together as a unit, "we refer to the BIA and IJ as 'the agency.'" Id. (citing Pineda-Maldonado v. Garland, 91 F.4th 76, 80 (1st Cir. 2024)).

Whether a government is unwilling or unable to protect an asylum applicant from harm caused by a private actor is a question of fact. See Medina-Suguilanda v. Garland, 121 F.4th 316, 322-23 (1st Cir. 2024). Thus, our review of the IJ's finding on this issue proceeds under the substantial evidence standard.

See Khalil, 97 F.4th at 61.  Under that highly deferential standard, we are required to uphold the "agency's findings of fact so long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Medina-Suguilanda, 121 F.4th at 323 (internal quotation marks and citations omitted).  Put another way, we will disturb the agency's findings only if "in reviewing the record as a whole, 'any reasonable adjudicator would be compelled to conclude to the contrary.'"  Khalil, 97 F.4th at 61 (quoting Barnica-Lopez v. Garland, 59 F.4th 520, 527 (1st Cir. 2023)).

### III. DISCUSSION

We begin with the legal framework governing the issues raised by Castano's petition.  An applicant for asylum must qualify as a "refugee" within the meaning of the Immigration and Nationality Act.  See Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023); 8 U.S.C. § 1158(b)(1)(A).  A refugee is someone who cannot return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  De Pena-Paniagua v. Barr, 957 F.3d 88, 92 (1st Cir. 2020) (quoting 8 U.S.C. § 1101(a)(42)(A)).

For conduct to qualify as "persecution," there must be a connection to government action or inaction.  See Khan v. Holder, 727 F.3d 1, 7 (1st Cir. 2013).  Thus, if the alleged persecution

- 8 -

is based on the conduct of a private actor, the asylum applicant must establish that the "government is unwilling or unable" to control that private conduct. Id.; see also 8 U.S.C. § 1101(a)(42)(A).[6]

A similar test applies to withholding of removal. See Espinoza-Ochoa, 89 F.4th at 230. "To obtain relief in the form of withholding of removal, an [applicant] must establish a clear probability that, if returned to his homeland, he will be persecuted on account of a statutorily protected ground." Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021) (citing 8 U.S.C. § 1231(b)(3)(A)). To meet this standard, an applicant must prove "three discrete elements," including "a threshold level of past or anticipated serious harm, [and] a nexus between that harm and government action or inaction." Barnica-Lopez, 59 F.4th at 528 (quoting Sanchez-Vasquez, 994 F.3d at 46). Unlike asylum,

---

[6] Castano devotes a portion of his brief to arguing that the death threats levied against him by the gang were serious enough to rise to the level of persecution. But the agency did not reach this question -- nor was it obligated to do so under the circumstances -- because of its dispositive determination that Castano had failed to establish that the Colombian government was unwilling or unable to protect him from the gang. See INS v. Bagamasbad, 429 U.S. 24, 25-26 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."). We also do not reach this issue because our review is limited to the grounds invoked by the agency. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

withholding of removal requires a showing of "a clear probability of persecution," which is a more demanding standard than "well-founded fear," and an applicant's subjective fear is not relevant. See id. (first quoting Sanchez-Vasquez, 994 F.3d at 46; and then citing Aguilar-Escoto v. Sessions, 874 F.3d 334, 337-38 (1st Cir. 2017)); see also Singh v. Garland, 87 F.4th 52, 62 (1st Cir. 2023).

Castano does not challenge the agency's determination that the Gulf Clan is a private entity. Thus, the key question posed in this case is whether Castano demonstrated a government connection to the Gulf Clan's actions by showing that Colombia was either unwilling or unable to protect him and his family from the gang's death threats.

The agency found, and the parties do not dispute, that Colombia was willing to protect Castano from the Gulf Clan. Castano contests, however, the agency's determination that Colombia was able to protect him. After reviewing the record, we conclude that there was substantial evidence to support the IJ's factual findings as to Colombia's ability to protect Castano and his family.

## A. Government Nexus

Castano contends that the record compels the conclusion that Colombia was unable to protect him and his family. To support his argument, he emphasizes that (1) he continued to receive

telephonic death threats even after the police had stationed a guard at his bakery and (2) the government's response to his complaint -- including its investigation into the threats -- was woefully inadequate.

We cannot agree with Castano that the record compels the conclusion he urges for at least two reasons. First, the record is unclear as to whether Castano reported the continued telephonic threats after the police stationed a guard at his bakery. And even if he did, the Colombian government's inability to stop the telephonic threats completely is not enough under our precedent to overturn the agency's denial of relief here. Second, there is substantial evidence in the record to support the agency's factual determination that the police responded immediately to the death threats and that the response was "fruitful," such that the Colombian government was able to protect the family. We address each of these points in turn.

To begin, to the extent that Castano focuses his petition on the fact that the telephonic death threats continued even after a police guard was posted at his bakery, it was his burden to establish that he reported these ongoing threats to the authorities at that time. See Morales-Morales v. Sessions, 857 F.3d 130, 135 (1st Cir. 2017) (noting that the "burden of showing the requisite government . . . inaction" falls on the asylum applicant). The record, however, is inconsistent on this point and thus cannot

- 11 -

compel the conclusion that Castano urges us to adopt.  See, e.g., Penafiel-Peralta v. Garland, 115 F.4th 1, 10 (1st Cir. 2024).

Although the failure to report may be excused if reporting would be futile, Castano has not made a futility argument.  See Morales-Morales, 857 F.3d at 135.  In any event, the record would not compel the conclusion that an additional report would have been futile, given the police's demonstrably quick and meaningful response to Castano's initial complaint.  To the contrary, the record indicates that the police did take steps to prevent telephonic threats after Castano's initial report, including by blocking the specific numbers used to make those threats.

Although the telephonic threats continued (from different numbers), Castano does not identify additional reasonable steps that the police could have taken to address the threats.  Rather, in his testimony before the IJ, Castano appeared to indicate that he wanted "a police officer protecting [him] 24 hours a day."  Such a request, however, would not be reasonable.  After all, "no government c[an] provide the sort of absolute protection [Castano] seeks."  Ortiz-Araniba v. Keisler, 505 F.3d 39, 43 (1st Cir. 2007).  Instead, there is substantial evidence to support the agency's conclusion that Colombia's response, even if not entirely successful, was "[in]distinguishable from any other government's struggles to combat a criminal element."  Burbiene v.

- 12 -

Holder, 568 F.3d 251, 255 (1st Cir. 2009). And as we have explained, the mere fact that a government is not entirely successful in combatting crime is not enough to establish that it is unable to protect an applicant seeking refugee status under the immigration laws. See id. at 255-56.

Next, as to Castano's claims about the police investigation, "'the most telling datum' in determining whether the government was willing and able to protect the petitioner is whether 'the local authorities responded immediately to each incident.'" Medina-Suguilanda, 121 F.4th at 324 (quoting Gómez-Medina v. Barr, 975 F.3d 27, 32 (1st Cir. 2020)). If local authorities have "appropriately responded to incidents of violence," this court is "particularly unwilling to overturn [the agency's] finding of no government connection." Khan, 727 F.3d at 7.

Here, the police acted immediately after Castano reported the in-person threat by stationing a guard at his bakery. After the police took this step, the in-person threats ceased. Although we do not discount the fear Castano and his family experienced from the ongoing telephonic death threats, the agency appropriately considered the police's quick and meaningful response to Castano's initial complaint. As the federal government

argues, this is substantial evidence supporting the IJ's finding that the Colombian government is able to protect Castano.[7]

Castano nevertheless contends that the police investigation was inadequate, and that this alleged fact compels the conclusion that the Colombian government was not able to protect him. Specifically, Castano maintains in his brief to us that the police did not interview witnesses or file charges. In his testimony before the IJ, however, Castano admitted that the police did investigate his complaint, but that he never received "a response or any answer about" the investigation itself. The record is therefore silent on what steps the police actually took in conducting the investigation.

Castano invokes Rosales Justo v. Sessions, 895 F.3d 154 (1st Cir. 2018), but his reliance on that decision to support his inadequate investigation argument is misplaced. As an initial matter, Rosales Justo is distinguishable because the court in that case was conducting a de novo review of the administrative record,

_____

[7] Castano notes that he and his family entered the United States several months after the in-person threats ceased. He therefore asserts that the agency incorrectly relied on the fact that he did not face any in-person threats "in the last few months before" departing for the United States to conclude that the Colombian government had "the situation [] under control." Castano cites no authority, however, to suggest that the effect of a government's response must extend over a particular duration for an IJ to find that the government is both willing and able to protect the petitioner. Thus, Castano's argument on this point does not compel the conclusion that the Colombian government was unable to protect him.

not evaluating the agency's findings for substantial evidence. See id. at 156; see also Vila-Castro v. Garland, 77 F.4th 10, 14 (1st Cir. 2023) (distinguishing Rosales Justo by procedural posture and standard of review and applying the substantial evidence standard). Mindful of the different standard of review employed in Rosales Justo, we nevertheless consider that decision as it applies to Castano's arguments.

In Rosales Justo, we concluded that the BIA had committed legal error when it overturned the IJ's findings that Mexico was unable to protect the petitioner and his family. The facts in Rosales Justo were quite different: the petitioner's son was murdered by a criminal organization shortly after it had issued death threats to the family, and the family continued to be pursued after it had relocated within Mexico. See 895 F.3d at 157-58. After reviewing the record as a whole, we determined that the IJ's factual finding that Mexico was unable to protect the petitioner and his family could not be clearly erroneous. See id. at 167. We reached that conclusion for a number of reasons, including that the evidence "showed nothing about the quality of [Mexico's] investigation [of the son's murder] or its likelihood of catching the perpetrators" and instead "suggested that the investigation was unlikely to make [petitioner's] family any safer." Id. at 164.

The Rosales Justo court also distinguished our prior decisions regarding the "unwilling or unable" standard, explaining that the records in those cases included evidence that "investigative efforts by the government had proved fruitful, demonstrating the ability of the police to protect [the petitioner] from persecution." Id. In prior cases like Khan, for example, the court found substantial evidence to support the agency's finding that the Pakistani government was able to protect the petitioner because the police had investigated his reports of threats and violence, made arrests, and called on the country's army to secure the area where he lived. See 727 F.3d at 7-8. The court so held even though Pakistan had not completely "eradicated" the threats against the petitioner and the investigative efforts had been "stymied by the fact that the identities of the perpetrators remained unknown." Id. at 8. Since Rosales Justo, we have continued to emphasize that "fruitful" government efforts to protect an asylum applicant from harm -- even absent an investigation leading to an arrest -- can support a finding that the government is able to protect the applicant. See Singh, 87 F.4th at 61 (determining that governmental action was "fruitful" given that the persecutors fled after the army was called).

Although the record here lacks details about the quality of the police investigation of the Gulf Clan's actions, there is substantial evidence that the police "fruitfully" responded to the

actions known to them. After Castano initially reported the in-person and telephonic threats, the police posted a guard at the bakery and attempted to block future calls from the Gulf Clan to Castano and his family. Once the police stepped in, there were no more in-person threats. And while the telephonic threats did continue even after the police response, there is no evidence in the record of any attempt by Gulf Clan members to act upon the telephonic threats. Further, Castano could not point to any evidence that he reported the continued telephonic threats to the authorities after the guard took up the post at his bakery.

Further, the fact that Castano never received a formal response about the identity of the alleged perpetrators does not necessarily indicate that the police were not investigating. To be sure, the federal government conceded at oral argument before us that it would be very difficult for the Colombian police to catch the perpetrators, considering the size of the Gulf Clan, the motorcycle helmets worn by the gang members when they threatened Castano in person, and the unknown phone numbers used to make the telephonic threats. Nevertheless, there is probative evidence that the police's response here was "fruitful" with respect to the conduct that Castano definitively reported. See Khan, 727 F.3d at 8.

Castano resists the conclusion that substantial evidence supports the agency's findings, despite these record facts, and

cites to J.R. v. Barr, 975 F.3d 778, 784 (9th Cir. 2020). He claims that J.R. stands for the general proposition that he should not have to wait for a criminal organization to carry out its death threats to qualify for asylum.

As the federal government points out, however, J.R. is inapposite. Critically, the court in J.R. determined that El Salvador was unwilling to protect the petitioner because the government had withdrawn protection from him after he had testified at a murder trial against members of the Mara-18 gang. See 975 F.3d at 783. What is more, the extreme facts in J.R., which involved severe physical harm to the petitioner and murders of two of his family members, were materially different.[8] Courts have subsequently refused to apply J.R. to cases involving a government's ability to protect those seeking asylum or to cases involving less dire circumstances. See Aguilar v. Garland, No. 23-1256, 2024 WL 3886973, at *2 (9th Cir. Aug. 21, 2024); see also Hidalgo-Nunez v. Garland, No. 22-9518, 2022 WL 6861520, at *3 (10th Cir. Oct. 12, 2022). We similarly decline to apply the ruling in J.R. to the very different facts here, especially when the issue

---

[8] Specifically, gang members cut off two of the petitioner's fingers; shot him seven times, causing him to lose his right lung; and killed his son on the front porch of their home. See J.R., 975 F.3d at 780. After the petitioner fled with his family to a different part of the country to live with a relative, the gang began threatening the relative's family, offered a reward for the murder of the petitioner, and, ultimately, attacked the relative and killed his brother. See id. at 781.

before us is a government's ability, rather than its willingness, to provide protection.

Accordingly, we hold that substantial evidence supports the agency's determination that the Colombian government was able to protect Castano and his family. Thus, we will not disturb the agency's ruling that Castano failed to demonstrate a government nexus to the Gulf Clan's threats and, for that reason, he was not eligible for asylum or withholding of removal.

## B. Procedural Challenges

Castano also lodges two procedural challenges to the BIA's decision. First, he argues that the BIA should have evaluated de novo whether the undisputed facts in the record demonstrated that the Colombian government was unable to protect his family from the Gulf Clan. Instead, according to Castano, the BIA merely "rubber-stamped the IJ's conclusion." Second, he contends that the agency "turned a blind eye to the fact that despite some modest police response, the [death] threats against [him and his family] did not abate," thus committing a legal error by overlooking significant aspects of the record. The federal government replies that Castano has waived his first argument by not including it in the "Statement of Issues" in his brief to us. Putting aside any potential waiver, Castano's procedural arguments are not supported by our precedent or the record.

First, the BIA applied the correct standard of review to the IJ's unwilling-or-unable determination. Our precedent makes clear that whether a government is unwilling or unable to protect an individual from harm by a private actor is a factual question, and thus the BIA should review an IJ's finding on this issue for clear error. See Medina-Suguilanda, 121 F.4th at 322.

Second, both the IJ and the BIA noted in their respective decisions that the telephonic threats against Castano and his family continued, and thus they did not overlook this aspect of the record. Indeed, the BIA expressly discussed in its decision that, "[a]s stated by the [IJ], Gulf Clan members continued their telephonic threats, which were not acted upon, but did not threaten [Castano] in person again after he was provided with police protection." The BIA's decision may have been brief, but it was sufficient to "reveal the essence of [its] decisional calculus." Lopez Perez v. Holder, 587 F.3d 456, 460 (1st Cir. 2009). "[A]n agency's decision must illuminate the path of its reasoning, but it need not do so at great length or in exquisite detail." Id. This is especially so if the BIA is adopting the IJ's decision. See id. at 460-61. Here, the BIA explained, citing many of the cases we discussed above, that "where a government makes a concerted effort to combat a particular problem, the fact of limited success is not evidence that the government is unable or

unwilling to control it."  Thus, the agency considered, and did not overlook, the evidence that Castano identifies.

## IV. CONCLUSION

For all these reasons, we **<u>deny</u>** the petition for review.